EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Santiago Apolinar Rondón<br><br>Recurrido | Certiorari<br><br>2025 TSPR 113<br><br>216 DPR ___ |
| --- | --- |

Número del Caso: CC-2025-0117

Fecha: 4 de noviembre de 2025

Tribunal de Apelaciones:

    Panel III

Oficina del Procurador General:

    Hon. Omar Andino Figueroa
    Procurador General

    Lcdo. Edwin B. Mojica Camps
    Subprocurador General

    Lcda. Aracelis Burgos Reyes
    Procuradora General Auxiliar

Representante legal de la parte recurrida:

    Lcdo. Danny López Pujals

Materia: Procedimiento Criminal – La cláusula constitucional contra registros y allanamientos irrazonables no protege a una persona que se encuentra ilegalmente o no tiene autorización para estar en el lugar registrado o allanado; Factores para determinar si una propiedad aparenta estar abandonada o desocupada.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Santiago Apolinar Rondón<br><br>Recurrido | CC-2025-0117 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada Rivera Pérez.

En San Juan, Puerto Rico, a 4 de noviembre de 2025.

El caso ante nuestra consideración nos permite precisar un principio básico de nuestro derecho constitucional sobre la protección consagrada en el Artículo II, Sec. 10, de la Constitución de Puerto Rico, *infra*. En específico, nos brinda la oportunidad de reiterar que para que se active dicha protección, es indispensable determinar -como cuestión de umbral- si la persona albergaba una expectativa razonable de intimidad en el lugar allanado o registrado. Solo en los casos en que exista una expectativa de intimidad, es que cobra vigencia la protección constitucional que garantiza nuestra Carta de Derechos. Además, el presente caso nos ofrece la oportunidad de adoptar diversos factores de otras jurisdicciones para evaluar la creencia objetiva de los agentes del orden público respecto a la expectativa de

intimidad de una persona que se encuentra en una propiedad que aparenta estar desocupada o abandonada, a fin de determinar la validez de un registro y allanamiento sin orden judicial.

En cuanto a los hechos particulares del caso que nos ocupa, nos corresponder resolver si erró el Tribunal de Apelaciones al confirmar el dictamen del Tribunal de Primera Instancia que suprimió la evidencia por considerar que fue ocupada sin una orden judicial y de manera irrazonable. Esto es a pesar de que quedó probado -y así lo reconoció el foro de instancia- que la persona arrestada en el apartamento carecía de expectativa de intimidad por encontrarse ilegalmente en la propiedad objeto del registro y allanamiento. Adelantamos que erró el foro recurrido.

## I

Por hechos presuntamente ocurridos el 10 de julio de 2023, en el restaurante Ropa Vieja, ubicado en Condado, municipio de San Juan, el Ministerio Público (peticionario) presentó ocho denuncias contra el señor Santiago Apolinar Rondón (recurrido).

En específico, el Ministerio Público le imputó al recurrido presuntamente haber cometido los siguientes delitos: dos cargos por infracción al Artículo 93 (a) de la Ley Núm. 146-2012, según enmendada, Código Penal de Puerto Rico (Código Penal), 33 LPRA sec. 5142; un cargo por el Artículo 93 (a) del Código Penal, *supra*, en la modalidad de tentativa; un cargo por el Artículo 249 (b) del Código Penal,

33 LPRA sec. 5339; un cargo por el Artículo 6.05 de la Ley Núm. 168-2019, según enmendada, Ley de Armas de Puerto Rico de 2020 (Ley de Armas), 25 LPRA sec. 466d; y tres cargos por el Artículo 6.14 de la Ley de Armas, 25 LPRA sec. 466m.[1] El Tribunal de Primera Instancia determinó causa probable para arresto -en ausencia- por la totalidad de los delitos imputados, y expidió la correspondiente orden de arresto contra el recurrido.

Según consta del expediente, la orden de arresto fue diligenciada el 13 de julio de 2023.[2] Al recurrido se le ocupó, en el Residencial Manuel A. Pérez, edificio E-10, apartamento 78, un arma de fuego marca *Glock*, modelo 19, calibre 9 mm, cargadores marca *Glock* y municiones calibre 9 mm.[3]

Tras varios incidentes procesales de rigor, el 19 de octubre de 2023, el Ministerio Público presentó ocho acusaciones contra el recurrido por los delitos antes mencionados.[4] Posteriormente, dichas acusaciones fueron enmendadas.[5]

Comenzado el juicio por jurado, el 7 de octubre de 2024, el Ministerio Público presentó el testimonio del agente Heriberto García Rivera del *Task force* de los alguaciles federales.[6] El testimonio del agente Rivera García reveló que,

---

[1] Anejo III de la Petición de *Certiorari*, págs. 52-67.
[2] Anejo IV de la Petición de *Certiorari*, págs. 70-71.
[3] Anejo V de la Petición de *Certiorari*, págs. 72-73.
[4] Anejo VI de la Petición de *Certiorari*, págs. 74-89.
[5] Anejo VII de la Petición de *Certiorari*, págs. 90-108. Las enmiendas se realizaron con el propósito de incluir testigos a las acusaciones.
[6] Anejo VIII de la Petición de *Certiorari*, pág. 109. Regrabación de la vista celebrada el 7 de octubre de 2024.

el 11 de julio de 2023, se encontraba investigando una orden de arresto contra el señor Santiago Apolinar, la cual le había sido asignada por el sargento Rodríguez. Según el agente Rivera García, el 13 de julio de 2023, a las 8:00 a.m., recibió una confidencia relacionada a este caso, razón por la cual acudió al apartamento 78 del edificio 10 en el Residencial Manuel A. Pérez. Conforme a lo que detalló el agente Rivera García, parte de los apartamentos del edificio estaban desocupados debido a trabajos de remodelación, y en el lugar había empleados de una compañía privada realizando labores. El agente realizó una vigilancia en el lugar y corroboró, con el Departamento de la Vivienda de San Juan, quién vivía en el apartamento. Además, precisó que "vivienda" lo autorizó a entrar a dicho apartamento.

De conformidad con el relato del agente, al llegar al apartamento tocó la puerta en varias ocasiones sin obtener respuesta, razón por la cual decidió forzar la entrada. Explicó que nadie podía vivir en esa residencia. Describió que, al ingresar al apartamento, únicamente encontró una silla; el resto del lugar estaba vacío. Añadió que, a su lado derecho se ubicaba la cocina y observó al señor Santiago Apolinar detrás de una pared, por lo que procedió a emitirle los comandos verbales.

El testimonio del agente Rivera García estableció que verificó el apartamento para asegurarse de que no hubiese otra persona que pudiera causarle daño. Señaló que entró al primer cuarto ubicado al lado derecho, el cual se encontraba

completamente vacío; allí solo pudo observar, en una de las tablillas superiores del clóset, un arma color negra marca *Glock*, dos magazines negros y uno verde. Especificó que el cuarto no contaba con ningún mueble. Por último, indicó que se comunicó con el agente José González Pérez, quien posteriormente se hizo cargo de la investigación.

A preguntas de la defensa, el agente Rivera García admitió que no tenía una orden judicial para allanar el apartamento 78 del edificio 10. Además, admitió que la persona que se encontraba en el apartamento reaccionó positivamente a las órdenes que se le impartieron, sin presentar peligro alguno para los agentes. Igualmente, afirmó que el registro llevado a cabo no fue producto de un *hot pursuit*. No obstante, como parte del examen redirecto, el agente manifestó que, según la información obtenida, el apartamento se encontraba a nombre de una persona identificada como Victor y había sido abandonado en mayo de 2023. Asimismo, la fiscal le preguntó por qué no necesitaba una orden para registrar el apartamento, a lo que este respondió que había confirmado que el inmueble estaba abandonado. En cuanto al arma y los magazines ocupados, mencionó que se encontraban a distancia de quince a veinte pies del recurrido.

A raíz del testimonio del agente Rivera García, la defensa del recurrido solicitó que se celebrara una vista, al amparo de la Regla 109 de las Reglas de Evidencia de Puerto Rico, 32 LPRA Ap. VI, con el propósito de determinar la admisibilidad de la evidencia ocupada en el apartamento. Lo

anterior, se debió a que no se había emitido una orden judicial de allanamiento en este caso.[7] Por su parte, el Ministerio Público se opuso argumentando que en nuestro ordenamiento jurídico la orden de registro y allanamiento solo es necesaria en los casos en que se violaría la expectativa de intimidad de una persona. De este modo, el Ministerio Público señaló que el testimonio del agente Rivera García acreditó que el señor Apolinar Rondón carecía de expectativa de intimidad en el apartamento donde fue arrestado, por lo cual que no era requerida una orden judicial de registro y allanamiento.

El 8 de octubre de 2024, el foro primario celebró una vista al amparo de la Regla 109 de las Reglas de Evidencia, *supra*.[8] En lo concerniente, el Ministerio Público sentó a testificar al señor Andrés Bruno Feliciano y al agente José González Pérez.[9]

Del testimonio del señor Bruno Feliciano surge que este trabajaba como coordinador de seguridad de MAS Corporation, compañía subcontratada por el Departamento de la Vivienda para administrar los residenciales públicos en el municipio de San Juan. Entre sus funciones se encontraban velar por la seguridad de los residentes *bona fide*. Explicó que un residente *bona fide* era aquel que cumplía con los requisitos

---

[7] Véase Anejo VIII de la Petición de *Certiorari*, pág. 109. Regrabación de la vista celebrada el 7 de octubre de 2024.
[8] Anejo XI de la Petición de *Certiorari*, pag. 133. Regrabación de la vista celebrada el 8 de octubre de 2024.
[9] Por no ser pertinente a la controversia del caso ante nosotros, no reseñaremos el testimonio del agente Rosado Rodríguez quien declaró sobre la cadena de custodia de la evidencia.

de solicitar una vivienda y que tenía contrato con MAS Corporation y el Departamento de la Vivienda. Agregó que también eran residentes *bona fide* los familiares del residente solicitante, quienes debían formar parte del contrato. Además, manifestó que la información que se obtenía del residente y de la composición familiar se almacenaba en una base de datos llamada YARDI.

En cuanto a los hechos particulares de este caso, el testimonio del señor Bruno Feliciano estableció que, el 13 de julio de 2023, el agente Rivera García se comunicó con él vía telefónica para obtener información sobre la composición familiar del apartamento 78. Detalló que, según la información generada por el sistema YARDI, el residente del apartamento era el señor Víctor Benítez, quien había llegado al residencial público el 27 de enero de 2023. Declaró que tenía conocimiento personal de que el señor Benítez ocupó el apartamento hasta finales del mes de marzo de ese año, debido a que había solicitado un movimiento de residencia por motivos de seguridad. Aclaró que, pese a ello, para la fecha del 13 de julio de 2023, el apartamento únicamente estaba designado al señor Benítez.

El señor Bruno Feliciano continuó narrando que el sistema YARDI no arrojó información alguna sobre el señor Apolinar Rondón, pues según los datos obtenidos, este no figuraba como residente de los proyectos que MAS Corporation administraba. Asimismo, se admitió como *Exhibit* #12 del Pueblo de Puerto Rico una Certificación de MAS Corporation,

la cual había sido firmada por el señor Bruno Feliciano el 13 de julio de 2023.[10] Mediante dicha certificación, el señor Bruno Feliciano hizo constar que el apartamento 78 del edificio E-10, ubicado en el residencial Manual A. Pérez, estaba registrado a nombre del señor Benítez desde enero de 2023, y que este no residía en el mismo desde el mes de mayo de ese año. Además, la Certificación estableció que la persona arrestada en el apartamento no era parte de la composición familiar del mismo, por lo que se encontraba ilegalmente en la unidad. Afirmó que, luego de mayo de 2023, nadie estaba autorizado a vivir en ese apartamento.

Por otro lado, a preguntas de la defensa el señor Bruno Feliciano admitió que el trámite de la certificación se llevó a cabo de manera electrónica y que el agente Rivera García la solicitó luego de haberse diligenciado el arresto. También, admitió que la llamada solicitándole dicha certificación se produjo en horas de la tarde.

Por su parte, el agente González Pérez, adscrito al CIC de San Juan, declaró que el día del allanamiento su supervisor le indicó que los *US Marshalls* habían puesto bajo arresto al señor Apolinar Rondón. Señaló que se personó, junto con otros agentes, al Residencial Manuel A. Pérez, donde habían arrestado al recurrido. Tras describir el edificio al que acudió, manifestó que dentro de un apartamento se encontraba el señor Apolinar Rondón esposado. Precisó que dicho apartamento estaba en desuso y no contaba

---

[10] Anejo IX de la Petición de *Certiorari*, pág. 110.

con enseres eléctricos ni muebles. Sostuvo que, al llegar al apartamento, conversó con los agentes que realizaron el arresto, quienes le indicaron que había un arma de fuego en uno de los cuartos. Destacó que los cuartos del apartamento estaban completamente vacíos.

A través del testimonio del agente González Pérez se admitieron en evidencia varias fotos que entraron como los *Exhibits* # 19, 21, 22, 23, 25, 34 y 35 del Pueblo de Puerto Rico.[11] El agente expresó que las fotografías fueron tomadas con el propósito de evidenciar el arma de fuego ocupada y demostrar que, en efecto, el apartamento estaba en desuso y estaba siendo ocupado por el recurrido.

Luego de culminado el testimonio del agente González Pérez, la representación legal del recurrido señaló que surgía de la prueba que el arma de fuego había sido ocupada ilegalmente, toda vez que no existía una orden judicial o autorización válida por parte de MAS Corporation para entrar al apartamento. Añadió que tampoco surgía de la prueba que el registro y allanamiento se hubiese realizado en el contexto de un *hot pursuit*. En ese sentido, solicitó la supresión de la evidencia ocupada. Por su parte, el Ministerio Público argumentó que era inconsecuente la autorización por parte de MAS Corporation o la existencia de una orden judicial, pues la prueba desfilada demostró que el recurrido no estaba autorizado a ocupar la propiedad, por lo que no albergaba una expectativa de intimidad.

---

[11] Anejo X de la Petición de *Certiorari,* págs. 111-129.

Durante la argumentación del Ministerio Público, la Jueza de instancia intervino para aclarar que la controversia ante su consideración versaba sobre la ocupación del arma, y no sobre el arresto. Sin embargo, **puntualizó que no existía controversia respecto a que el recurrido carecía de expectativa de intimidad y que el arresto había sido legal.** Una vez las partes reiteraron sus argumentos, y que el Ministerio Público señalara que se trataba de un registro incidental al arresto, el Tribunal de Primera Instancia declaró "ha lugar" la supresión de la evidencia ocupada. El foro primario concluyó que no se cumplió con el criterio de razonabilidad y que no se establecieron los criterios para validar un registro incidental al arresto.[12]

En desacuerdo, el Ministerio Público, representado por la Oficina del Procurador General de Puerto Rico, presentó un recurso de *certiorari* ante el Tribunal de Apelaciones.[13] En esencia, sostuvo que el foro de instancia había cometido un error de derecho al suprimir la evidencia ocupada, ello debido a que había quedado demostrado que el recurrido carecía de expectativa de intimidad y de legitimación activa para solicitar dicha supresión. Además, señaló que la ocupación había sido razonable, ya que la evidencia se observó a plena vista tras un registro de precaución en el diligenciamiento de una orden de arresto contra el recurrido.

---

[12] Anejo II de la Petición de *Certiorari*, págs. 47-51
[13] Anejo I de la Petición de *Certiorari*, págs. 1-44.

El 27 de enero de 2025, Tribunal de Apelaciones expidió el recurso de *certiorari* y confirmó el dictamen recurrido.[14] El foro apelativo concluyó que, según surgía del testimonio del agente Rivera García, el registro no fue incidental al arresto, pues se había extendido a otras áreas del apartamento, en lugar del área adyacente al recurrido. Asimismo, el foro intermedio razonó que en este caso no se cumplía con la doctrina del *protective sweep*.[15]

Oportunamente, el Ministerio Público presentó ante nosotros una petición de *certiorari* mediante la cual nos solicitó que revoquemos la *Sentencia* emitida por el Tribunal de Apelaciones y ordenemos la admisión de la evidencia ocupada. En síntesis, argumenta que el recurrido no albergaba una expectativa de intimidad en el apartamento en que se encontraba al momento de su arresto, razón por la cual no contaba con legitimación activa para solicitar la supresión de la evidencia ocupada. En esa línea, el Ministerio Público señaló que no era necesario evaluar la razonabilidad del registro sin orden, pues no se constituyó un registro bajo nuestro ordenamiento jurídico, ya que el recurrido carecía de expectativa de intimidad. Por su parte, el recurrido se

---

[14] Véase KLCE202401144.

[15] Cabe señalar que la *Sentencia* contó con un voto disidente del Hon. Monge Gómez. Mediante esta, el Juez del Tribunal de Apelaciones expresó que en este caso procedía denegar la solicitud de supresión de evidencia. Ello debido a que el recurrido carecía de legitimación activa para invocar la protección que ofrece nuestra Constitución contra los registros y allanamientos irrazonables. Por consiguiente, la opinión disidente precisó que no era necesario analizar la licitud de la ocupación conforme a la excepción constitucional sobre el registro incidental al arresto, ni determinar si los hechos del caso justificaban la aplicación de la doctrina del *protective sweep*.

opuso argumentando que, independientemente de la expectativa de intimidad del señor Apolinar Rondón, el Ministerio Público no cumplió con el requisito de razonabilidad.

El 2 de mayo de 2025, expedimos el recurso ante nuestra consideración. Transcurridos los términos para que las partes presentaran sus respectivos alegatos, procedemos a resolver conforme a derecho.

## II

### A

El Artículo II, Sec. 10, de la Constitución de Puerto Rico, LPRA, Tomo I, ed. 2023, pág. 340, establece que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar o registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

Dicha disposición es análoga a la Enmienda Cuarta de la Constitución de los Estados Unidos.[16] *Pueblo v. Álvarez De Jesús*, 214 DPR 753 (2024); *Pueblo v. Yip Berríos*, 142 DPR

---

[16] Específicamente, la Enmienda Cuarta de la Constitución de los Estados Unidos dispone que:

> "No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas". Emda. IV, Const. EE. UU., LPRA, Tomo 1, pág. 187.

386 (1997). Su objetivo básico, al igual que su equivalente federal, es proteger el ámbito de intimidad y dignidad del ser humano frente a actuaciones arbitrarias del Estado. Íd., citando a *Katz v. United States*, 389 US 347 (1967). Véase, además: *Pueblo v. Rivera Colón*, 128 DPR 672 (1991); J. M. Farinacci Fernós, *La Carta de Derechos*, San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021, pág. 167. En esa línea, hemos señalado que dicha protección "no entraña un derecho propietario; es una protección que ampara personas, no lugares". (Énfasis suprimido) *Pueblo v. Valenzuela Morel*, 158 DPR 526, 539 (2003) citando a *Pueblo v. Vargas Delgado* 105 DPR 335 (1976).

Ahora bien, este Tribunal ha sostenido que nuestra constitución ofrece una protección más amplia que su homóloga federal. *Pueblo v. Álvarez De Jesús*, *supra*; *Pueblo v. Rolón Rodríguez*, 193 DPR 166 (2015). Es decir, "[e]l reconocimiento expreso del derecho a la intimidad en nuestra Constitución, y la preeminencia de éste al momento de evaluar las acciones gubernamentales, permiten que el alcance de la protección contra registros y allanamientos sea mayor". *Pueblo v. Rolón Rodríguez*, *supra*, pág. 175. No obstante, aunque nuestro derecho a la intimidad sea de factura más ancha, **"el criterio de expectativa razonable a la intimidad es igualmente controlante, tanto en relación a si se activa la protección constitucional como en relación al grado de dicha protección"**. E. L. Chiesa Aponte, *Procedimiento criminal y la Constitución: etapa investigativa*, San Juan, Ed. SITUM,

2017, pág. 244. Véase, también: E. L. Chiesa Aponte, *Los Derechos de los acusados y la factura más ancha*, 65 Rev. Jur. UPR 83, 136 (1996) ("Aunque pueda hablarse de que el derecho a la intimidad en Puerto Rico es de rango superior al que tiene bajo la Constitución Federal, esto no se refleja en el criterio para activar la protección constitucional contra registros, incautaciones y detenciones irrazonables").

**Así, el alcance de la protección contra registros y allanamientos irrazonables dependerá de si la persona afectada alberga una expectativa razonable de intimidad.** *Pueblo v. Soto Soto*, 168 DPR 46 (2006). A esos efectos, en *Pueblo v. Díaz, Bonano*, 176 DPR 601, 613 (2009) expresamos que:

> **La determinación de la existencia de una expectativa razonable de intimidad que active la protección de la cláusula constitucional es una cuestión de umbral que debe determinarse antes de considerar si la intervención gubernamental fue razonable.** *Pueblo v. González*, supra. **Una vez se determina la configuración de un registro por parte del Estado, entonces el siguiente peldaño consiste en realizar un balance de intereses entre esa expectativa y los intereses estatales que hayan motivado la actuación estatal.** *Pueblo v. Cedeño Laclaustra*, 157 D.P.R. 743, 788 (2002); *Pueblo v. Yip Berríos*, supra; *Pueblo v. Dolce*, 105 D.P.R. 422, 434-435 (1976).

> **En síntesis, lo primero que se debe auscultar y analizar es si, en esencia, ha ocurrido o no un registro por parte del Estado para que se extienda la protección constitucional aludida. Si la conclusión del análisis es que no ha habido un registro, vano sería aplicar la doctrina de balance de intereses, puesto que no se activaría la garantía constitucional contra registros y allanamientos irrazonables.**[17] (Énfasis nuestro).

---

[17] Por su parte, el profesor Chiesa Aponte ha expresado que:

> **"Este criterio de expectativa razonable de intimidad funciona en dos niveles. En primer lugar, y como cuestión de umbral, para que se active la protección constitucional, quien la reclama debe haber tenido una expectativa razonable a la intimidad en relación con la acción gubernamental**

Cabe destacar que, como regla general, nuestro ordenamiento jurídico requiere que se obtenga una orden judicial para poder efectuar un registro o allanamiento. *Pueblo v. Báez López*, 189 DPR 918 (2013). **No obstante, "cuando se alega una violación al derecho constitucional contemplado en la Sec. 10 del Art. II de nuestra Constitución,** *supra***, es necesario determinar si ocurrió un registro que haya infringido la expectativa razonable de intimidad que se le reconoce a un individuo sobre el objeto registrado"**. (Énfasis nuestro). *Pueblo v. López Colón*, 200 DPR 273, 284 (2018). **En ese sentido, la actuación del Estado puede sostenerse ya sea porque no se activó la protección constitucional ante la ausencia de expectativa de intimidad,** o porque, aun existiendo tal expectativa, prevalecieron los intereses oponibles del gobierno. Chiesa Aponte, *supra*, pág. 137.[18]

---

**impugnada. Ausente tal expectativa, no hay "registro" para fines de la protección constitucional.** Así ocurre cuando los agentes registran la basura abandonada para su recogido. En segundo lugar, **satisfecho el requisito de umbral de un mínimo de expectativa razonable de intimidad,** el grado o magnitud de la expectativa razonable de intimidad puede determinar si la actuación del gobierno es razonable, al confrontarse la expectativa de intimidad con el interés social que pueda invocar el gobierno para justificar su actuación." E. L. Chiesa Aponte, *Procedimiento criminal y la Constitución: etapa investigativa*, San Juan, Ed. SITUM, 2017, pág. 248.

[18] Este Tribunal ha adoptado y definido situaciones excepcionales en las que no es indispensable la orden judicial previa, las cuales deberán examinarse a la luz de los hechos de cada caso. Dichas circunstancias son las siguientes:

"(1) un registro incidental a un arresto legal; (2) un registro consentido voluntariamente de forma expresa o implícita; (3) un registro en situación de emergencia; (4) una evidencia ocupada en el transcurso de una persecución; (5) una evidencia a plena vista; (6) cuando el agente del

Determinar si una persona goza de expectativa de intimidad implica, primeramente, que haya exhibido una expectativa subjetiva de intimidad. *Acarón et al. v. D.R.N.A.*, 186 DPR 564 (2012) citando a *Pueblo v. Ortiz Rodríguez*, 147 DPR 433 (1999). "No se trata de una simple reserva mental, sino de una conducta de actos afirmativos que demuestren, inequívocamente, la intención de alojar dicha expectativa". *Pueblo v. Ortiz Rodríguez*, *supra*, pág. 442. Además, si se identifica una expectativa individual de intimidad, se pasará a una segunda etapa en la que se evaluará si dicha expectativa es reconocida como razonable por la sociedad. *Weber Carrillo v. ELA et al.*, 190 DPR 688 (2014); *Acarón et al. v. D.R.N.A.*, *supra*.

De igual forma, para establecer si existe una expectativa razonable de intimidad, es necesario analizar de manera integral los siguientes factores: lugar registrado o allanado; naturaleza y grado de la intervención policial; objetivo o propósito de esa intervención; si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; existencia de barreras físicas que restrinjan la entrada o la visibilidad al lugar registrado; número de

---

orden público obtiene conocimiento de la existencia del material delictivo por el olfato; (7) una evidencia arrojada o abandonada; (8) un registro o allanamiento de una estructura abandonada; (9) una evidencia obtenida durante un registro administrativo siempre que se cumpla con las limitaciones expresadas por este Tribunal en[*Blassini et als. V. Depto. Rec. Naturales*, 176 DPR 454 (2009)]; (10) un registro tipo inventario; o (11) una evidencia obtenida en un lugar público —como el aeropuerto— como resultado de la utilización de canes para olfatear". (Citas omitidas). *Pueblo v. Báez Lopez*, 189 DPR 918, 930-932 (2013).

personas que tienen acceso legítimo al lugar registrado, e inhibiciones sociales relacionadas con el lugar registrado. *Pueblo v. Ortiz Rodríguez*, *supra*.

En lo relativo al interior del hogar, hemos señalado en el pasado que es la zona sobre la cual una persona legítimamente tiene la mayor expectativa de intimidad. *Pueblo v. Soto Soto*, *supra*. Asimismo, la protección de nuestra Constitución y de la Enmienda Cuarta de la Constitución federal se ha extendido a la zona de la casa conocida como la inmediación (*curtilage*). *Pueblo v. Rivera Colón*, *supra*, pág. 683. Véase, además: *United States v. Dunn*, 480 US 294 (1987).

Sin embargo, también hemos sostenido que "**[u]na persona que se encuentra ilegalmente en un sitio no tiene legitimación activa para reclamar el derecho contra un registro irrazonable garantizado constitucionalmente, pues no tiene expectativa de intimidad alguna. El peso de probar que estaba legalmente en dicho sitio le corresponde al acusado**". (Énfasis nuestro). *Pueblo v. Ramos Santos*, 132 DPR 363, 371-372 (1992) citando a W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 4, Sec. 11.3(b). Véase, además: *Acarón et al. v. D.R.N.A.*, *supra*.

Al respecto, destacamos lo resuelto en *Pueblo v. Ramos Santos*, *supra*. En dicha situación fáctica, la policía recibió una confidencia sobre que el acusado se encontraba en el apartamento 1003-A del Residencial Las Acacias. Cuando la

policía derribó la puerta del apartamento para lograr acceso, observaron al señor Ramos Santos saltar hacia el apartamento contiguo a través del balcón. Uno de los agentes ocupó una cuchilla en dicho apartamento. Acto seguido, el dueño del apartamento contiguo, 1004-A, autorizó la entrada de los agentes. Por consiguiente, pusieron bajo arresto al señor Ramos Santos y ocuparon un arma. En consecuencia, la defensa del acusado solicitó la supresión de la evidencia ocupada en el apartamento 1003-A y el apartamento 1004-A.

En esa ocasión, **resolvimos que la solicitud de supresión de la evidencia del apartamento contiguo no procedía, toda vez que el acusado no tenía legitimación activa para solicitarla, pues carecía de una expectativa legítima de intimidad. Aclaramos que "[n]o sólo estaba ilegalmente en dicho apartamento, sino que la Policía entró al mismo con el permiso y consentimiento del dueño".** (Énfasis nuestro). *Pueblo v. Ramos Santos*, *supra*, pág. 374. Además, clarificamos que, en cuanto al apartamento 1003-A, se logró establecer que el acusado estaba de visita, lo cual le confería una expectativa de intimidad. Sin embargo, la dueña del apartamento consintió a que estos registrasen el apartamento. De este modo, resolvimos que el registro no fue irrazonable o ilegal.

Ahora bien, en el caso que nos ocupa, el registro y allanamiento se efectuó en un apartamento que aparentaba estar desocupado o abandonado. En cuanto a las estructuras abandonadas, **hemos señalado que estas no están cubiertas por**

**la garantía constitucional contra registros y allanamientos.** *Pueblo v. Erausquín Martínez*, 96 DPR 1 (1968) (*Per Curiam*).

En relación con la expectativa de intimidad que puede albergarse en una vivienda que aparenta estar abandonada o desocupada, algunas jurisdicciones estatales, así como tribunales de la jurisdicción federal, han recurrido a diversos factores para determinar si existe una expectativa subjetiva de intimidad del acusado que la sociedad estaría dispuesta a reconocer como objetivamente razonable.

Entre los factores subjetivos se encuentran los siguientes: (1) si el acusado tenía un interés propietario o posesorio sobre el lugar intervenido; (2) si su presencia en dicho lugar era legítima; (3) si ostentaba dominio o control total, incluyendo el derecho a excluir a terceros; (4) si, previo a la intervención, adoptó precauciones usuales por parte de quienes buscan preservar su intimidad; (5) si el inmueble era utilizado con fines privados; y (6) si su reclamo de privacidad resulta coherente con las nociones históricas de intimidad. Véanse: *People v. Mayweather*, 2009 WL 1099729(Mich. Ct. App. Apr. 23, 2009); *United States v. Whitehead*, 415 F.3d 583 (6th Cir. 2005); *Whiting v. State*, 885 A.2d 785, 800 (2005); *Davis v. State*, 119 S.W.3d 359 (Tex. App. 2003); *People v. Taylor*, 253 Mich. App. 399 (2002); *United States v. Gale*, 136 F.3d 192 (D.C. Cir. 1998); *United States v. Garcilazo-Martinez*, 881 F. Supp. 265(S.D. Tex. 1994); *People v. Brewer*, 690 P.2d 860 (Colo. 1984); *People v. Sumlin*, 105 Misc. 2d 134 (Sup. Ct. 1980).

De igual forma, algunas jurisdicciones han tomado en consideración distintos factores para determinar si, a la luz de la totalidad de las circunstancias, un agente de la policía contaba con una creencia objetivamente razonable de que la propiedad se encontraba efectivamente abandonada o desocupada. En consecuencia, la creencia objetiva en estas situaciones podría justificar una entrada y registro sin orden judicial debido a la ausencia de una expectativa de intimidad, por lo que no se activaría la protección constitucional contra registros y allanamientos. Ninguno de estos factores resulta por sí solo determinante, por lo que deberán evaluarse caso a caso. Véanse: *State v. Brown*, 216 N.J. 508 (2014); *People v. Taylor*, *supra*.

Dentro de los factores objetivos considerados por los tribunales para determinar si un lugar se encuentra abandonado o desocupado —y, en consecuencia, si una persona puede albergar una expectativa razonable de intimidad en él— se encuentran los siguientes: (1) la apariencia exterior del inmueble; (2) su condición general; (3) el estado de la vegetación en la propiedad; (4) la existencia de barreras colocadas y firmemente aseguradas en todas las aberturas; (5) señales de que la residencia no recibe servicios independientes de gas o electricidad; (6) la ausencia de enseres electrodomésticos, muebles u otros enseres comúnmente encontrados en una vivienda; (7) el tiempo que transcurre antes de que las barreras temporales sean sustituidas por puertas y ventanas funcionales; (8) el

historial del inmueble y su uso previo; y (9) denuncias relacionadas con actividades ilícitas llevadas a cabo en la estructura. Véanse: *State v. Brown*, *supra*; *United States v. Harrison*, 689 F.3d 301 (3er Cir. 2012); *People v. Martin*, 2011 WL 1049189 (Mich. Ct. App. Mar. 22, 2011); *People v. Harbin*, 2010 WL 785940 (Mich. Ct. App. Mar. 9, 2010); *People v. Mayweather*, *supra*; *People v. Taylor*, *supra*; *U.S. v. McRae*, 156 F.3d 708 (6to Cir. 1998).

Con estos factores en mente, los tribunales estatales y federales han validado un registro y allanamiento sin orden debido a que no le han reconocido una expectativa de intimidad a una persona que se encuentra en una propiedad que aparenta estar abandonada o desocupada. Véanse, por ejemplo: *People v. Taylor*, *supra*. ("We hold that the entry into and contemporaneous search of an abandoned structure is presumptively reasonable because 'the owner no longer has an expectation of privacy in the property that he has abandoned.' Police officers do not need a warrant before entering structures that, by all objective manifestations, appear abandoned") (Cita omitida). *People v. Harbin*, *supra*. ("The officers did not need a search warrant before entering the house because, by all objective manifestations, the house was abandoned. Although defendant may have had the right to occupy the house, the officers did not violate any legitimate expectation of privacy protected under the Fourth Amendment when they entered the house without a warrant") (Cita omitida); *People v. Martin*, *supra*. ("Defendant did not have

standing to raise this issue in the trial court, as he had no legitimate expectation of privacy. […] An owner has no expectation of privacy in abandoned property and the search of such property is presumptively reasonable where the structure, by all objective manifestations, appears to be abandoned. Not only was defendant not the homeowner, there was no question that the home had been abandoned") (Citas omitidas). *United States v. McRae*, *supra*. ("The district court's finding that the house was vacant was not clearly erroneous. Further, the district court properly concluded that McRae did not have a legitimate expectation of privacy by virtue of having stayed a week in the vacant premises that he did not own or rent").

Analizada la jurisprudencia estatal y federal, adoptamos los factores antes reseñados con el propósito de que sirvan de guía al momento de examinar si los agentes del orden público tenían una creencia objetivamente razonable para determinar la validez de un registro y allanamiento en el contexto de una propiedad que aparenta estar desocupada o abandonada, de forma que se pueda convalidar la intervención sin orden judicial.

**B**

Como foro revisor hemos resuelto reiteradamente que no intervendremos con la apreciación y adjudicación de credibilidad que en relación con la prueba testifical haya realizado el juzgador de los hechos a nivel de instancia. *Pueblo v. Toro Martínez*, 200 DPR 834 (2018); *Pueblo v.*

*Irizarry*, 156 DPR 780(2002); *Pueblo v. Bonilla Romero*, 120 DPR 92 (1987). Dicha deferencia responde al hecho de que los juzgadores de instancia se encuentran en una mejor posición para evaluar, aquilatar y adjudicar la prueba presentada ante ellos. *Pueblo v. Negrón Ramírez*, 213 DPR 895 (2024). No obstante, salvo que se demuestre la existencia de pasión, prejuicio, parcialidad, error manifiesto, o cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble, no habremos de intervenir con la apreciación efectuada. *Pueblo v. Irizarry*, *supra*, pág. 789.

### III

En el caso ante nuestra consideración, el Ministerio Público, representado por la Oficina del Procurador General de Puerto Rico, sostiene que incidió el Tribunal de Apelaciones al confirmar el dictamen del Tribunal de Primera Instancia que suprimió la evidencia ocupada en el caso de epígrafe. En esencia, señala que en este caso no existe controversia respecto a que el recurrido no tenía una expectativa razonable de intimidad en un apartamento que ocupó ilegalmente, por lo que no se activó la protección constitucional contra registros y allanamientos. Por tanto, según el Ministerio Público, los foros recurridos no debieron evaluar la razonabilidad del registro a la luz de la excepción del *protective sweep*.[19] Por su parte, el recurrido

---

[19] El *protective sweep* es una búsqueda rápida y limitada de una propiedad, incidental a un arresto y llevada a cabo para proteger la seguridad de

señala que, independientemente de la expectativa de intimidad del recurrido, en este caso no se cumplió con el requisito de razonabilidad.

Como explicamos previamente, el Artículo II, Sec. 10, de nuestra Constitución consagra la protección del individuo y sus pertenencias contra registros y allanamientos irrazonables. Su objetivo básico es proteger la intimidad y la dignidad del ser humano. Por tanto, para que se active dicha protección, es necesario que la persona afectada alberge una expectativa razonable de intimidad. Una persona goza de la protección constitucional de expectativa legítima de intimidad si posee una expectativa subjetiva de intimidad, y dicha expectativa es una que la sociedad está dispuesta a reconocer como razonable.

En ese sentido, la determinación de la existencia de una expectativa razonable de intimidad es una cuestión de umbral que debe determinarse antes de considerar si la intervención gubernamental fue razonable. De esta forma, si se concluye, como primer paso, que no existe tal expectativa, no hay registro para fines de la protección constitucional. En consecuencia, no procede pasar sobre el segundo paso de determinar si la actuación gubernamental fue razonable.

---

los agentes de la policía o de otras personas. Bajo la doctrina del *protective sweep*, el Tribunal Supremo de los Estados Unidos ha señalado que la Enmienda Cuarta permite un registro sin orden cuando se demuestren hechos que justifiquen razonablemente que el área registrada representa un peligro para los agentes de la policía u otras personas. Véase *Maryland v. Buie*, 494 US 325 (1990).

En cuanto a las estructuras abandonadas o desocupadas, mencionamos que otras jurisdicciones utilizan diversos factores que adoptamos y que nos permiten determinar si existe una expectativa subjetiva de intimidad que la sociedad estaría dispuesta a reconocer como objetivamente razonable. Igualmente, existen factores que sirven de guía a los tribunales para determinar, si, a la luz de la totalidad de las circunstancias, un agente de la policía contaba con una creencia objetivamente razonable de que una propiedad se encontraba efectivamente abandonada o desocupada, por lo que dicha creencia justificaría la entrada y registro sin orden judicial por la carencia de expectativa de intimidad. Al aplicar estos factores al caso de autos es evidente que el recurrido no puede legítimamente reclamar una expectativa razonable de intimidad en el apartamento que fue arrestado. Veamos.

De la prueba, quedó demostrado que el recurrido no tenía ningún interés propietario o posesorio sobre el apartamento. El testimonio del agente Rivera García acreditó que este corroboró con el Departamento de la Vivienda que el apartamento se encontraba abandonado antes de la intervención, cuyo hecho fue recogido posteriormente mediante certificación a esos efectos, por ello el recurrido no estaba autorizado a ocuparlo. De la misma manera, el testimonio del señor Bruno Feliciano confirmó que, para la fecha del registro y allanamiento, el apartamento únicamente estaba designado al señor Benítez, y que este lo había

desocupado varios meses antes. Por último, el señor Bruno Feliciano testificó que no había obtenido información alguna del sistema YARDI sobre el señor Apolinar Rondón; según los datos obtenidos, este no había sido residente de los proyectos que MAS Corporation administraba.

Los hechos probados, los cuales no son meras conjeturas, en este caso nos llevan a concluir de manera lógica y jurídicamente sustentada que el recurrido se encontraba de forma ilegal en el lugar, de modo que carecía de expectativa legítima de intimidad. Incluso, la doctrina establece que le correspondía al acusado demostrar que se encontraba legalmente en el lugar, criterio que no logró probar. *Pueblo v. Ramos Santos*, *supra*. El acusado en este caso no presentó evidencia de autorización alguna del Departamento de la Vivienda para ocupar el apartamento.

En este caso, existen hechos que, bajo un análisis de la totalidad de las circunstancias, demuestran que el agente Rivera García razonablemente creyó que el acusado no tenía una expectativa de intimidad dentro del apartamento 78, del edificio E-10 del Residencial Manual A. Pérez. Si bien es cierto que la policía no contaba con una orden judicial de registro y allanamiento, al ponderar los factores previamente enunciados, surge con claridad que el agente actuó bajo la convicción razonable de que el apartamento se encontraba abandonado o desocupado. Los testimonios del agente Rivera García y del agente González Pérez establecieron que el lugar se encontraba vacío. Es decir, estos señalaron que el

apartamento no contaba con enseres electrodomésticos ni con muebles. Este hecho también quedó demostrado con las fotos admitidas en evidencia.

De hecho, luego de escuchar la prueba, **el foro de instancia determinó que el recurrido carecía de expectativa de intimidad**, esto previo a concluir que el registro había sido irrazonable. En este extremo, como instancia revisora, le debemos gran deferencia al foro de instancia, quien tuvo la oportunidad de aquilatar la prueba en este caso. *Pueblo v. Negrón Ramírez*, *supra*. Además, el recurrido no presentó argumento alguno que nos muevan a pensar lo contrario; que tenía una expectativa de intimidad legítima. Sin embargo, se enfocó en el segundo criterio, al concentrar sus argumentaciones en atacar la razonabilidad del registro.

En conclusión, el recurrido no tiene legitimación activa para reclamar el derecho contra un registro irrazonable garantizado constitucionalmente, pues, a la luz de la totalidad de las circunstancias y demás factores pertinentes, carecía de expectativa de intimidad. En consecuencia, resulta improcedente el análisis de razonabilidad efectuados por los foros recurridos, toda vez que no se cumplió con la cuestión de umbral requerida de albergar una expectativa razonable de intimidad en el lugar allanado o registrado.

**IV**

Por los fundamentos antes expuestos, se revoca el dictamen del Tribunal de Apelaciones, que confirmó la

determinación emitida por el Tribunal de Primera Instancia mediante la cual se suprimió la evidencia ocupada en el caso de epígrafe. Se devuelve el caso al foro primario para que los procedimientos continúen de forma compatible con lo aquí dispuesto.

Se dictará Sentencia de conformidad.


Camille Rivera Pérez
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Santiago Apolinar Rondón<br><br>Recurrido | CC-2025-0117 | *Certiorari* |

Sentencia

En San Juan, Puerto Rico, a 4 de noviembre de 2025.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca el dictamen del Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Candelario López emitió la siguiente expresión de conformidad, a la cual se unió el Juez Asociado señor Feliberti Cintrón:

> "*Hay dos formas de ser engañado: una consiste en creer en lo que no es cierto y la otra en negarse a creer lo que es cierto.* – **Søren Kierkegaard.**
>
> Estoy conforme con la determinación revocatoria que emite hoy este Tribunal, pues **no ha creído lo que no es cierto ni se ha negado a creer lo que es cierto.** Estoy convencido de que la determinación que hoy tomamos en mayoría es la ruta que procede en derecho y la más apropiada. Los hechos sostienen que el Sr. Santiago Apolinar Rondón (señor Apolinar Rondón) se encontraba prófugo de la justicia ya que se le había encontrado causa para arresto por los delitos de asesinato, tentativa de asesinato y violaciones a la Ley de Armas. En este caso, según determinó el propio Tribunal de Primera Instancia, al cual debemos entera deferencia, este

no tenía una expectativa de intimidad por encontrarse de manera ilícita en una propiedad que estaba desocupada. De todas maneras, debemos recalcar el testimonio del agente Rivera García durante el juicio. A partir del mismo, se estableció que el agente confirmó que el inmueble estaba abandonado y que, al entrar al mismo, el lugar estaba vacío. Como parte de sus labores, luego de emitir los comandos verbales al señor Apolinar Rondón, el agente Rivera García verificó el resto del apartamento para asegurarse que no hubiese otra persona que pudiera atentar contra su integridad física y causarle daño.

Como bien indica la Opinión que hoy se certifica, en esta controversia debemos tener en cuenta ante todo que, el alcance de la protección contra registros y allanamientos irrazonables depende de si la persona afectada alberga alguna expectativa de intimidad. *Pueblo v. Soto Soto,* 168 DPR 46, 55 (2006). Ello pues ante la ausencia de tal expectativa, no hay garantías de protección constitucional.

Ahora bien, considero pertinente emitir unas expresiones sobre el análisis para determinar si el agente actuó bajo la convicción razonable de que el apartamento se encontraba abandonado. Estoy en total acuerdo con adoptar los factores que algunas jurisdicciones han tenido en consideración al momento de determinar si un agente de la policía contaba con una creencia objetivamente razonable de que la propiedad se encontraba efectivamente abandonada para justificar su entrada y registro a la misma sin orden judicial. Aclaramos que no se trata de que el Estado tenga una carta blanca para validar una intrusión en residencias que aparenten estar en estado de abandono. Por el contrario, se trata de sopesar en conjunto y de manera objetiva todos los factores que hoy adoptamos para guiarnos según los hechos de cada caso y a la luz de la totalidad de las circunstancias. Este análisis cuidadoso, indudablemente, nos permitirá precisar si la creencia del agente de que la propiedad estaba abandonada justifica la entrada y registro del lugar sin orden judicial por la carencia de expectativa de intimidad.

Por otro lado, aprovechamos estas expresiones para resaltar que recientemente, la Corte Suprema de Estados Unidos atendió una controversia que podría parecer similar, pero que se distingue de los hechos del caso que hoy resolvemos. En *Byrd v. United States,* 584 US 395 (2018), la Corte Suprema de Estados Unidos atendió una controversia relacionada a la expectativa de intimidad de un conductor no autorizado de un vehículo alquilado.

En el caso se determinó que el mero hecho de que un conductor que posee o controla legítimamente un vehículo alquilado no figure en el contrato de arrendamiento no anula su expectativa razonable de intimidad, de otro modo válida. Íd., a la pág. 411. Sin embargo, la Corte aclaró que una persona que usa un vehículo de manera fraudulenta o equiparable a un ladrón de autos no tendría esa protección. Íd., a la pág. 409.

La diferencia del caso de *Byrd v. United States, supra*, y el caso de referencia que hoy atendemos es simple: En el primero hay una posesión lícita en virtud del consentimiento de la arrendataria del vehículo, mientras que en el caso de autos el señor Apolinar Rondón ocupaba ilegalmente el apartamento. La evidencia demostró que la vivienda se encontraba abandonada, sin muebles ni enseres, y que el acusado ocupaba el espacio de forma ilegal, sin vínculo alguno con el arrendatario original ni con la autoridad administradora del residencial. En consecuencia, no puede sostenerse que tuviera una expectativa subjetiva ni objetivamente razonable de intimidad, pues su presencia en el inmueble fue producto de una ocupación clandestina y contraria a derecho. A diferencia de *Byrd*, donde la expectativa se basaba en una tenencia legítima reconocida socialmente, el caso de autos involucra un acto de usurpación que, por su propia naturaleza ilícita, excluye toda protección constitucional".

El Juez Asociado señor Colón Pérez emitió una Opinión Disidente, a la cual se unieron la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez.


                    Javier O. Sepúlveda Rodríguez
                    Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.                     CC-2025-0117     *Certiorari*

Santiago Apolinar Rondón

    Recurrido

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ a la que se unen la Jueza Presidenta ORONOZ RODRÍGUEZ y el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico a 4 de noviembre de 2025.

¿Cuántos muebles y/o enseres electrodomésticos se tienen que poseer para tener derechos constitucionales? ¿Cama y nevera? ¿O también estufa? Y si el dinero no me alcanza para comprar una cama y la Policía fuerza su entrada a mi apartamento sin una orden de registro, ¿me quedo sin remedio en ley? O si no he podido pintar mi casa ni podar la grama desde hace años, porque perdí movilidad y no tengo ayuda, ¿eso implica una carta blanca para que agentes del orden público entren a mi residencia y se metan a todos los cuartos a ver qué encuentran?

Éstas son sólo algunas de las preguntas que muchos puertorriqueños y puertorriqueñas se tendrán

que plantear tras el desafortunado y peligroso precedente que hoy ha sentado una mayoría de mis compañeros y compañeras de estrado. La decisión que hoy emite este Tribunal no tan solo es jurídicamente errada, sino que atenta contra los derechos fundamentales de las personas más vulnerables de nuestra sociedad. Veamos.

I.

A.

De entrada, para la más cabal comprensión del presente caso, -- y el problema que representa la norma jurídica a la que ha dado pie --, resulta imprescindible examinar minuciosamente los hechos que dan margen a la causa de epígrafe, según surgen del expediente ante nuestra consideración. Procedemos, pues, a ello.

B.

Durante la mañana del jueves 13 de julio de 2023, el agente Heriberto Rivera García (en adelante, "agente Rivera García") recibió una llamada mediante la cual fue alertado de que el Sr. Santiago Apolinar Rondón (en adelante, "señor Apolinar Rondón") se podría encontrar en el apartamento 78, del edificio E-10, del Residencial Manuel A. Pérez (en adelante, "el apartamento"). Dos días antes de esa fecha, -- el 11 de julio de 2023 --, se había asignado al agente Rivera García una orden de arresto contra el señor Apolinar Rondón, por presuntamente cometer los delitos de asesinato, tentativa de asesinato y violaciones a la Ley de Armas.

A base de dicha confidencia, el agente Rivera García se dirigió, esa misma mañana, al mencionado residencial y realizó una breve vigilancia del apartamento en cuestión. Allí, el referido agente sólo pudo observar que, en el edificio, habían empleados de una compañía privada realizando trabajos de remodelación en algunos apartamentos.

Durante ese periodo de observación, el agente Rivera García no vio a persona alguna entrar o salir del apartamento. Tampoco observó circunstancias sospechosas.

No empece a ello, y sin obtener una orden judicial de registro y allanamiento, el agente Rivera García decidió tocar a la puerta del apartamento en cuestión varias veces. Al no recibir respuesta, el referido agente procedió a romper la puerta del apartamento y forzar su entrada.

Una vez dentro del mencionado apartamento, el agente Rivera García observó al señor Apolinar Rondón detrás de una pared en el área de la cocina. Acto seguido, el referido agente le instruyó los comandos verbales al señor Apolinar Rondón, a los que éste respondió sin mostrar resistencia alguna. Inmediatamente, el agente Rivera García esposó al señor Apolinar Rondón y registró su persona de forma incidental al arresto.

Sin embargo, a pesar de que el referido agente ya había encontrado y puesto bajo custodia a la persona contra quien tenía una orden de arresto, -- y, sin tener indicio o sospecha alguna de que hubiera otra persona en el apartamento --, el agente Rivera García procedió a registrar otros espacios de

la vivienda. En lo pertinente a la controversia ante nos, el mencionado agente procedió a entrar al primer cuarto que le quedaba a mano derecha.

En esta habitación, el agente Rivera García observó que no había nadie y que no había muebles. No obstante, dicho agente decidió registrar un gabinete ubicado encima del clóset de la habitación, dentro del cual encontró, -- colocados al fondo a la derecha --, un arma de fuego negra marca Glock, dos cargadores negros y uno verde. Estos artefactos, según se desprende del expediente ante nos, se encontraban a una distancia de entre unos quince (15) a veinte (20) pies desde donde fue arrestado el acusado.

Ante esta situación, el agente Rivera García informó el arresto del señor Apolinar Rondón y el hallazgo de la mencionada arma de fuego, por lo que llegaron otros policías al apartamento. Además, acudió al lugar personal técnico que se encargó de tomar fotografías del estado en que se encontraba el apartamento en cuestión y la evidencia que arrojó el registro del cuarto.

Dichas fotografías, las que también obran en el expediente de la causa de epígrafe, nos permiten constatar la realidad del apartamento. En su exterior, la entrada del apartamento en cuestión da hacia un pasillo abierto al aire libre con barandal. A su derecha, ubican unas escaleras. La puerta de entrada es completamente sólida (no translúcida), tiene una cerradura y, arriba, se lee el número "78".

Al entrar al apartamento, se observa una alfombra en el piso, justo frente a la entrada, de un largo aproximado de la altura de una persona promedio. Sobre dicha alfombra, hay una silla. En la pared del fondo, justo detrás del referido asiento, se ve ropa y ciertas pertenencias en el piso, pegadas al sócalo de la pared.

Al lado derecho, se encuentra la cocina, la cual tiene instalados gabinetes, con sus respectivas puertas; un tope de cocina; y un fregadero. Se observan ciertas pertenencias dentro de algunos de los referidos gabinetes y sobre el tope de cocina. El baño tiene una puerta, un inodoro, un lavamanos y, al fondo, una ducha con una ventana superior tipo "miami".

En cuanto a la habitación donde ocurrió el registro en controversia, se muestran todas sus ventanas instaladas, las cuales también son tipo "miami". En la pared perpendicular a la de las ventanas, está el armario y el gabinete más pequeño donde se encontró la evidencia controvertida. La altura del clóset se extiende hasta la mitad de la fila superior de la cuadrícula de ventanas. Dentro del clóset, hay un tubo con unos ganchos de ropa. Encima de dicho armario y, extendiéndose hasta el techo, ubica el referido gabinete. Tanto el clóset, como el gabinete, tienen sus respectivos pares independientes de puertas francesas (entiéndase, puertas dobles que abren hacia afuera), totalmente sólidas (no translúcidas).

Así las cosas, una vez iniciado el juicio por jurado contra el señor Apolinar Rondón, el 7 de octubre de 2024 el Ministerio Público presentó primero el testimonio del agente

García Rivera. En lo pertinente, el referido agente admitió que no había obtenido una orden judicial de registro y allanamiento antes de ingresar al apartamento en cuestión; que su entrada no se debía a una persecución en caliente (*hot pursuit*); que el acusado no representaba una amenaza o peligro para los agentes u otras personas; y que no tenía indicios de que hubiera otra persona en el apartamento.

**A pesar de las circunstancias antes mencionadas, el agente Rivera García señaló que entendía que no necesitaba una orden judicial para entrar al referido apartamento, porque le parecía que el lugar estaba abandonado. Además, sostuvo que el señor Apolinar Rondón se encontraba ilegalmente allí. Lo anterior, por no figurar este último en la composición familiar establecida en el contrato de arrendamiento de la unidad.**

Sobre este particular, el agente Rivera García declaró que se había comunicado con "Vivienda de San Juan" para pedir permiso de entrada e indagar quién vivía en el apartamento antes de forzar su entrada. No obstante, en el contrainterrogatorio, el agente Rivera García admitió que, cuando testificó que consultó la composición familiar del apartamento con "Vivienda", realmente se refería a la compañía privatizadora Management Administration Services Corp. (en adelante, "MAS Corporation"), administradora del Residencial Manuel A. Pérez mediante un subcontrato con el Departamento de la Vivienda.

Tras el testimonio del agente Rivera García, la representación legal del señor Apolinar Rondón solicitó que el Ministerio Público llamara como testigo al coordinador de seguridad de MAS Corporation, el Sr. Andrés Bruno Feliciano (en adelante, "señor Bruno Feliciano"). Éste último fue a quién el agente Rivera García llamó para indagar sobre la composición familiar del apartamento y solicitar una certificación a dichos efectos.

En lo pertinente, el testimonio del señor Bruno Feliciano confirmó que, tanto la llamada como la certificación solicitada por el agente Rivera García, ocurrieron en horas de la tarde del 13 de julio de 2023, luego de que se forzara la entrada sin orden al apartamento, se arrestara al acusado y se registrara la habitación donde se ocupó la evidencia en controversia. El texto de la certificación que suscribió el señor Bruno Feliciano, la cual fue admitida en evidencia, indica que dicho documento se preparó, a solicitud del agente Rivera García, "[e]n relación a un arresto realizado en el Residencial Manuel A. Pérez extensión 3081 en el edificio E-10 apartamento 78".[1]

Por último, el testimonio del señor Bruno Feliciano aclaró que la conclusión de que el señor Apolinar Rondón se encontraba ilegalmente en el apartamento, la cual plasmó en la certificación, surge únicamente a base de que su nombre no figuraba como un residente *bona fide* en el contrato de

---

[1] Anejo IX, pág. 66.

arrendamiento entre la persona que tenía asignada la unidad, el Sr. Víctor Benítez, y el Departamento de la Vivienda, ni en la base de datos del sistema computadorizado que utiliza MAS Corporation, a saber, YARDI.[2]

Así pues, el señor Apolinar Rondón solicitó al Tribunal de Primera Instancia la supresión de la evidencia incautada, bajo el fundamento de que ésta fue producto de un registro sin orden, ilegal e irrazonable. A dicha solicitud, el Ministerio Público se opuso.

Evaluados los argumentos de las partes, el foro primario determinó que procedía la supresión de la evidencia. En particular, el Tribunal de Primera Instancia concluyó que, a pesar de que el señor Apolinar Rondón carecía de una expectativa razonable de intimidad, procedía suprimir la evidencia impugnada por ésta haber sido producto de un registro irrazonable.

Inconforme con dicha determinación, el 21 de octubre de 2024, el Ministerio Público acudió al Tribunal de Apelaciones. En esencia, el Estado argumentó que el foro primario insidió al suprimir la evidencia controvertida, bajo los siguientes fundamentos: (1) el acusado carecía de legitimación para impugnar el registro del cuarto, debido a que no podía albergar una expectativa razonable de intimidad en el apartamento donde fue arrestado; y (2) se debieron aplicar las excepciones del

---

[2] El señor Bruno Feliciano explicó que un residente *bona fide* es aquel que cumpla con los requisitos de solicitar una vivienda y que tenga un contrato con MAS Corporation y el Departamento de la Vivienda, incluyendo a los familiares del residente solicitante, quienes también deben figurar en el contrato de arrendamiento.

"vistazo protector" (*protective sweep*) y la doctrina de evidencia a plena vista (*plain view*).

Por su parte, el señor Apolinar Rondón reafirmó sus planteamientos de que, en ausencia de una orden judicial previa, no existía justificación que permitiera a los agentes extender el registro a la habitación, pues el acusado ya se había puesto bajo arresto, no representaba peligro alguno y no se tenían indicios de que hubiese otra persona en la residencia, por todo lo cual el registro fue irrazonable. En ese sentido, sostuvo que el Tribunal de Primera Instancia actuó correctamente al declarar con lugar la solicitud de supresión de evidencia presentada por éste.

Evaluados los alegatos de ambas partes, el 27 de enero de 2025, el foro apelativo intermedio confirmó la decisión del foro primario. En síntesis, el Tribunal de Apelaciones fundamentó su postura en el razonamiento utilizado por el Tribunal de Primera Instancia referente a que, -- indistintamente de la existencia de una expectativa razonable de intimidad --, procedía la supresión de la evidencia por ésta ser producto de un registro irrazonable.

En desacuerdo todavía, el Ministerio Público acudió ante nos mediante un recurso de *Certiorari*. En éste, dicha parte sostiene los argumentos esbozados ante los foros inferiores, al igual que lo hace el acusado recurrido en su oposición a que se expidiese el mismo.

Como adelantamos, hoy, una mayoría de mis compañeros y compañeras de estrado atenta contra los derechos más

fundamentales que arropan a las personas en la santidad de su hogar. Lo anterior, al adoptar una norma que valida la intrusión del Estado en residencias cuya apariencia le permita a un agente alegar que se encontraba en estado de abandono. Con tan errado proceder, no podemos estar de acuerdo. Nos explicamos.

II.

A.

Como se sabe, la Constitución de Estados Unidos de América, en su Enmienda IV, establece que,

> [n]o se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas. Enmda. IV, Const. EE. UU., LPRA, Tomo 1.

Dicha cláusula constitucional, conocida como la protección contra los registros y allanamientos irrazonables, cobija a todas las personas contra las intromisiones arbitrarias del Estado en sus hogares, efectos personales y su cuerpo. *Carpenter v. U.S.*, 585 US 296, 304 (2018); *Maryland v. King*, 569 US 435, 446 (2013); *U.S. v. Jones*, 565 US 400, 406-407 (2012). Reiteradamente, el Tribunal Supremo de Estados Unidos ha resuelto que esta garantía protege a las personas contra toda intrusión injustificada por parte del Estado en las zonas donde se alberga una expectativa razonable a la intimidad. *Carpenter v. U.S.*, *supra*, pág. 304; *Kyllo v. U.S.*, 533 U.S. 27, 33 (2001); *Katz v. U.S.*, 389 US 347, 353 (1967).

Asimismo, la Constitución del Estado Libre Asociado de Puerto Rico contiene una cláusula similar, pero con un lenguaje mucho más abarcador. Nos referimos al Art. II, Sec. 10 de nuestra Constitución, incluido en la Carta de Derechos, el cual establece que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. Art. II, Sec. 10, Const. ELA, LPRA, Tomo 1.

Respecto a la extensión de la mencionada cláusula, este Tribunal siempre la ha interpretado junto al contenido de otras disposiciones constitucionales. Particularmente, de aquellas que, expresamente, reconocen el derecho constitucional a la intimidad y a la inviolabilidad de la dignidad del ser humano. Art. II, Secs. 1 y 8, *supra*. *Pueblo v. Rolón Rodríguez*, 193 DPR 166, 175 (2015); *Blassini et als. v. Depto. Rec. Naturales*, 176 DPR 454, 463-464 (2009).

### B.

Establecido lo anterior, cabe mencionar que la Cuarta Enmienda de la Constitución federal, así como la jurisprudencia que la interpreta, constituye el mínimo de garantía que vienen obligados a reconocer los ordenamientos jurídicos de las esferas estatales. De este modo, es norma reiterada en nuestra jurisdicción que, de ordinario, "la

aplicabilidad de un derecho constitucional federal constituye solo el ámbito mínimo federal de ese derecho". *Pueblo v. Díaz Bonano*, 176 DPR 601, 621 (2009).

Cónsono con ello, hemos sentenciado que los estados de los Estados Unidos y Puerto Rico gozan de la potestad de ofrecer una mayor protección o garantía constitucional que la reconocida bajo la Constitución federal. *Pueblo v. Díaz Bonano*, *supra*, pág. 621; *Díaz v. Colegio Nuestra Sra. Del Pilar*, 123 DPR 765, 770 (1989). Véase, además, E. Chiesa Aponte, *Los derechos de los acusados y la factura más ancha*, 65 (Núm. 1) Rev. Jur. UPR 83, 83 (1996). **Por tal razón, nuestra Carta Magna es una de factura más ancha que la federal, por lo que "reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos".** *López Vives v. Policía de P.R.*, 118 DPR 219, 227 (1987).

Este principio cardinal ha sido de particular aplicación a la protección contra registros y allanamientos irrazonables por parte del Estado, contenida en el Art. II, Sec. 10 de nuestra Constitución. Const. ELA, *supra*. Esto responde a que el texto de nuestra cláusula es, expresamente, más garantista que el de la cláusula análoga comprendida en la Cuarta Enmienda federal. Const. EE. UU., *supra*.

Como expusimos recientemente en nuestro disenso en *Pueblo v. Álvarez De Jesús*, 214 DPR 753, 798 (2024) (Colón Pérez, Opinión disidente), existen dos razones que motivan ese acercamiento: en primer lugar, "nuestra protección contra los

registros y allanamientos irrazonables emana de una experiencia histórica nacional de mayores privaciones de libertades individuales y, por tanto, nuestros constituyentes vislumbraron otorgarle un mayor alcance"; y, en segundo lugar, "el contenido de nuestra protección constitucional está afectado por otras disposiciones constitucionales que la amplían y ensalzan". *Íd.*

C.

Ahora bien, las precitadas garantías constitucionales sólo protegen a las personas contra registros y allanamientos que sean irrazonables. Por tanto, como regla general, los registros y allanamientos efectuados mediante una orden judicial, que cumpla con los requisitos constitucionales, se presumen razonables. Esto debido a que "[l]as órdenes judiciales de registro […] constituyen una protección fundamental para el derecho a la intimidad". E. Chiesa Aponte, *Procedimiento Criminal y la Constitución: etapa investigativa*, San Juan, Ediciones SITUM, 2017, pág. 303.[3]

El propósito del requisito de obtener una orden judicial previo a realizar un registro o allanamiento radica en que un magistrado pueda juzgar la razonabilidad y legalidad de la intervención antes de que ocurra una intromisión por parte del

---

[3] La validez de la orden de registro exige el cumplimiento de cuatro requisitos constitucionales: "(1) que [la orden] sea expedida por autoridad judicial o magistrado, (2) [basada en] una declaración bajo juramento, (3) de la que surja causa probable, y (4) especificidad en la orden en cuanto […] al lugar a ser registrado y lo que se autoriza a ser incautado". E. Chiesa Aponte, *Procedimiento Criminal y la Constitución: etapa investigativa*, San Juan, Ediciones SITUM, 2017, pág. 303. Al cumplirse estos requisitos, se justifica la presunción de razonabilidad de un registro realizado mediante orden judicial. Véase, *Pueblo v. Díaz Bonano*, 176 DPR 601, 645 (2009) (Hernández Denton, opinión disidente).

Estado en los intereses libertarios y propietarios de las personas. De este modo, se adelanta el fin de "proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión". *E.L.A. v. Coca Cola Bott. Co.*, 115 DPR 197, 207 (1984).

El Tribunal Supremo de Estados Unidos, al interpretar la contraparte federal de nuestro texto constitucional, ha señalado que la exigencia de una orden, como norma general, garantiza que las inferencias que fundamenten un registro o allanamiento sean deducidas por un magistrado neutral e independiente, en lugar de que sean juzgadas por un agente del orden público involucrado en la gesta, usualmente competitiva, de atender la criminalidad. *Riley v. California*, 573 U.S. 373, 382 (2014); *U.S. v. Ventresca*, 380 U.S. 102, 106 (1965); *Johnson v. United States*, 333 U.S. 10, 14 (1948).

De esta forma, también se preserva la efectividad de esta protección como un freno contra intromisiones arbitrarias y abusivas, particularmente en los hogares: "[a]ny assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity <u>and leave the people's homes secure only in the discretion of police officers</u>." (Énfasis suplido). *Johnson v. United States*, *supra*, págs. 13-14. Véase, además, *Byrd v. United States*, 584 U.S. 395, 403

(2018); *Arizona v. Gant*, 556 U.S. 332, 345 (2009); *U.S. v. Ventresca*, *supra*, pág. 106.

Por consiguiente, cuando el Estado realiza un registro sin orden judicial previa, la actuación estatal se presume irrazonable e inconstitucional, y, por tanto, inválida. *Pueblo v. Báez López*, 189 DPR 918, 930 (2013); *Blassini et als. v. Depto. Rec. Naturales*, *supra*, pág. 462. Véase, además, Chiesa Aponte, *op. cit.*, pág. 297. Al así quedar probado, nuestra constitución establece, de manera expresa, que la evidencia obtenida mediante esa actuación inconstitucional será inadmisible en los tribunales. Art. II, Sec. 10, Const. ELA, *supra*.[4] De esta forma, en nuestra jurisdicción, la denominada regla de exclusión de evidencia ilegalmente obtenida es un imperativo constitucional expreso, y no una mera norma jurisprudencial.

Empero, el Tribunal Supremo de Estados Unidos, así como esta Curia, ha reconocido ciertas excepciones. Si bien existen determinadas circunstancias en las que la actuación intrusiva del Estado se justifica, aun sin una orden judicial previa, se tratan de "situaciones excepcionales y definidas estrechamente por la jurisprudencia". *Pueblo v. Serrano Reyes*, 176 DPR 437, 443 (2009).

**Este acercamiento cauteloso resulta sabio, debido a que, si se siguen reconociendo y ampliando excepciones al requisito**

---

[4] La Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, provee el mecanismo procesal adecuado para lograr la supresión de la evidencia obtenida en contravención a lo dispuesto en nuestra Constitución.

**general de obtener una orden judicial antes de realizar un registro o allanamiento, este mandato constitucional pasará a convertirse en la excepción, y las excepciones pasarán a convertirse en la norma, dejando a las personas desprotegidas contra la invasión injustificada de su intimidad y propiedad.**

A esos efectos, se han reconocido como válidos los siguientes registros sin orden: (1) evidencia en campo abierto; (2) evidencia arrojada o abandonada; (3) evidencia a plena vista o percepción; (4) el registro para inventario; (5) el registro por motivo de emergencia; (6) el registro incidental a un arresto válido; y (7) el registro por consentimiento. Véase, *Hester v. United States*, 265 U.S. 57 (1924). Véanse, además, *Pueblo v. Lebrón*, 108 DPR 324 (1979); *Pueblo v. Rivera Colón*, 128 DPR 672 (1991); *Pueblo v. Dolce*, 105 DPR 422 (1976); *Pueblo v. Ortiz Martínez*, 116 DPR 139 (1985); *Pueblo v. Rodríguez Rodríguez*, 128 DPR 438 (1991); *Pueblo v. Rivera Collazo*, 122 DPR 408 (1988); *Pueblo v. Zayas Fernández*, 120 DPR 158 (1987); *Pueblo en interés del menor N.O.R.*, 136 DPR 949 (1994).

D.

Dicho esto, recordemos que, a la hora de determinar si aplica o no la referida protección constitucional, lo primero que venimos llamados a considerar es si, mediante la actuación del Estado, ha ocurrido un registro en el sentido constitucional. *Pueblo v. Báez López*, *supra*, págs. 928-929; *Pueblo v. Díaz Bonano*, *supra*, pág. 613. Para ello, de ordinario, debemos "determinar si se ha infringido una

expectativa de intimidad que la persona alberga subjetivamente y que la sociedad está preparada para reconocer como razonable". *Pueblo v. Díaz Bonano*, *supra*, pág. 645 (Hernández Denton, opinión disidente).

**Ahora bien, aunque ciertamente la mayor parte de nuestra jurisprudencia se ha centrado, a estos fines, en la articulación de una expectativa razonable de intimidad como una condición necesaria para activar las protecciones constitucionales contra registros y allanamientos irrazonables,[5] la realidad es que éste no es el único fundamento por el cual una persona podría ser acreedora de dichas garantías.** Desde mucho antes del desarrollo de la teoría moderna anclada en la intimidad que impulsó *Katz v. U.S.*, *supra*, y su progenie, se entendía que las protecciones de la Cuarta Enmienda se activaban cuando ocurría una intrusión o penetración física (*trespass*) en un espacio constitucionalmente protegido.

Más recientemente, una trilogía de casos resueltos por el Tribunal Supremo de Estados Unidos, -- compuesta por *United States v. Jones*, 565 U.S. 400 (2012); *Jardines v. Florida*, 569 U.S. 1 (2013); y *Grady v. North Carolina*, 575 U.S. 306 (2015) --, ha dejado claro que, al adoptar la teoría de la expectativa razonable de intimidad en *Katz*, no se descartaron estas intrusiones gubernamentales como bases suficientes para activar las garantías contra registros y allanamientos

---

[5] Véase, por ejemplo, *Pueblo v. Miranda Alvarado*, 143 DPR 356, 362 (1997); *Pueblo v. Santiago Alicea I*, 138 DPR 230, 235 (1995).

irrazonables. Es decir, aunque *Katz* podría añadir más circunstancias en las que se activen, no elimina nada de las protecciones de la Cuarta Enmienda cuando el Estado realiza una intrusión física (*trespass*) en un área constitucionalmente protegida con el fin de encontrar algo u obtener información.[6]

Al respecto, el profesor Chiesa nos comenta lo siguiente:

> Esta trilogía ilustra la nueva norma de la Corte Suprema de los Estados Unidos en relación con cuándo se activa la protección constitucional contra registros irrazonables, garantizada por la Enmienda Cuarta. **Ahora, la expectativa razonable de intimidad (*Katz*) es condición suficiente pero <u>no necesaria</u> para activar la protección. También es suficiente con la <u>intrusión o penetración</u> en uno de los cuatro <u>lugares</u> o <u>cosas</u> expresamente mencionadas en el texto constitucional: persona, <u>casa</u>, papeles o <u>pertenencias</u> ("efectos").** (Énfasis suplido) Chiesa Aponte, *op. cit.*, pág. 243.[7]

De hecho, ya este Tribunal había adelantado esta aclaración desde *Acarón v. DRNA*, 186 DPR 564 (2012), al señalar que "*Katz* no pretendió rechazar el planteamiento de que la Cuarta Enmienda también protegía el derecho de las personas contra la intromisión física de los agentes del Estado en

---

[6] *Florida v. Jardines*, 569 U.S. 1, 5 (2013) ("By reason of our decision in *Katz*, property rights 'are not the sole measure of Fourth Amendment violations,' —but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government does engage in [a] physical intrusion of a constitutionally protected area") (citas internas omitidas).

[7] La opinión mayoritaria alude a la obra del profesor Chiesa para sugerir que, aunque nuestro derecho a la intimidad es de factura más ancha, el criterio de la expectativa razonable de intimidad es controlante tanto con relación a la activación, así como al alcance de las protecciones constitucionales. Sin embargo, a tan solo tres párrafos de las expresiones citadas, el profesor Chiesa aclara que:

> **Todo lo dicho ha quedado modificado por la trilogía de opiniones de la Corte Suprema de los Estados Unidos, ya discutidos, conforme los cuales es <u>suficiente</u>, para activar la protección constitucional, con la <u>intrusión</u> con, o <u>penetración</u> en, uno de los <u>lugares</u> o <u>cosas</u> expresamente mencionados en el texto de la Cuarta Enmienda: persona, <u>casas</u>, papeles o <u>pertenencias</u>. Esta jurisprudencia <u>tiene</u> que ser reconocida en Puerto Rico.** (Énfasis suplido). Chiesa Aponte, *op. cit.*, pág. 245.

determinada propiedad. El Tribunal explicó que, más bien, el derecho a la intimidad no era el único interés albergado". *Íd.* pág. 575. Por tanto, está claro que las personas tienen dos bases o fundamentos para reclamar sus derechos contra registros y allanamientos irrazonables: (1) cuando alberguen una expectativa razonable de intimidad; o (2) cuando haya ocurrido una penetración o intrusión del Estado en o con lugares o cosas constitucionalmente protegidos, incluyendo residencias y pertenencias.

Lo anterior aplica incluso cuando la persona que impugne la legalidad del registro o allanamiento no sea dueña del espacio intervenido, siempre que ésta tenga posesión y control del lugar, de modo que pueda excluir a otros de él. Véase, *Byrd v. United States*, *supra*, págs. 405-407; *Minnesota v. Olson*, 495 U.S. 91 (1990); *Rakas v. Illinois*, 439 U.S. 128, 149 (1978).

### III.

Por último, cabe destacar aquí que, como foro revisor, debemos prestarle deferencia a la sana discreción de los foros sentenciadores, -- entiéndase, el Tribunal de Primera Instancia --, pues son éstos quienes están mejor posicionados para apreciar y adjudicar la credibilidad de la prueba y mejor conocen las particularidades del caso. Esa discreción consiste en el "poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, 165 DPR 324, 334 (2005); *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990); *Pueblo v. Sánchez González*, 90 DPR 197, 200

(1964). Véase, también, *Cruz Vélez v. CEE y otros*, 206 DPR 694 (2021) (Colón Pérez, opinión de conformidad); *VS PR, LLC v. Drift-Wind*, 207 DPR 253 (2021).

Así, las determinaciones de los foros primarios "deben ser respetadas por los foros apelativos, a menos, claro está, que se demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las partes, o la necesidad de un cambio de política procesal o sustantiva". *Rebollo López v. Gil Bonar*, 148 DPR 673, 678 (1999). Ello, adelantamos, no sucedió aquí.

Habiendo expuesto el marco normativo anterior, procedemos, pues, -- desde la disidencia --, a disponer de la presente controversia. Para facilitar el análisis y la comprensión, discutiremos conjuntamente nuestros planteamientos de derecho, -- ante la ruta improcedente e inapropiada que ha tomado hoy una mayoría de este Tribunal --, así como su aplicación a los hechos del presente caso.

IV.

Como mencionamos anteriormente, en esta ocasión, el Ministerio Público nos solicita la revocación de cierta determinación emitida por el Tribunal de Primera Instancia, -- y confirmada por el Tribunal de Apelaciones --, mediante la cual se suprimió determinada evidencia, presentada en el juicio que se llevaba contra el señor Apolinar Rondón, por considerar que ésta fue ocupada de manera irrazonable y sin la correspondiente orden judicial. En esencia, arguye los siguientes señalamientos de error respecto a los dictámenes

de los foros *a quo*: (1) determinar que procedía la supresión de la evidencia incautada, a pesar de que el acusado recurrido carecía de legitimación para impugnar el registro que la produjo, por no albergar una expectativa razonable de intimidad; y (2) concluir que no son aplicables las excepciones del "vistazo protector" (*protective sweep*) y la doctrina de plena vista (*plain view doctrine*). No le asiste la razón. Explicamos por qué.

En primer lugar, el Ministerio Público sostiene que el señor Apolinar Rondón carecía de una expectativa razonable de intimidad en el apartamento donde ubicaba la habitación cuyo registro arrojó la evidencia suprimida por los foros inferiores, de modo que el acusado no tenía legitimación (*standing*) para impugnar su admisibilidad. Ante dicho planteamiento, y, para revertir las determinaciones de los foros recurridos, la mayoría de mis compañeros y compañeras de estrado bifurcó su respuesta a la primera de las controversias ante nuestra consideración en dos teorías, **-- a nuestro juicio, jurídicamente erradas, inaplicables e improcedentes bajo el ámbito mínimo federal, según fueron aplicadas aquí --**, a saber: (1) la teoría de la "presencia ilegal" y (2) la teoría de la "estructura aparentemente abandonada". Comencemos por la primera.

La mayoría del Tribunal entiende que el señor Apolinar Rondón carecía de una expectativa razonable de intimidad, a base de la mera conjetura de que se encontraba "ilegalmente" en el apartamento en cuestión. Para llegar a la anterior

decisión, éstos y éstas basan su proceder en lo previamente resuelto en *Pueblo v. Ramos Santos*, 132 DPR 363 (1992); y *Acarón v. DRNA*, *supra*.

Como veremos, los hechos de autos distan mucho de los dos precedentes en que esta Curia ha basado su conclusión y, más importante aún, justifican que se aplique lo resuelto por el Tribunal Supremo de Estados Unidos en *Byrd v. United States*, *supra*, conforme a las exigencias de la Cuarta Enmienda; lo que nos obliga a comenzar la parte dispositiva de nuestro escrito pasando juicio sobre el particular.

Y es que, en el primero de los casos en que una mayoría de mis compañeros y compañeras de estrado apoya la errada conclusión a la que llegan, entiéndase *Pueblo v. Ramos Santos*, *supra*, este Tribunal acuñó la siguiente norma: "Una persona que se encuentra ilegalmente en un sitio no tiene legitimación activa para reclamar el derecho contra un registro irrazonable garantizado constitucionalmente, pues no tiene expectativa de intimidad alguna". *Íd.*, pág. 371. Sin embargo, previo a la aplicación de dicho precedente a la causa de epígrafe, resultaba imprescindible entender el contexto que motivó su adopción, así como las diferencias claras que existen entre ese caso y el de autos.

En síntesis, en *Pueblo v. Ramos Santos, supra,* un sargento de la Policía se encontraba atendiendo un incidente ocurrido entre la sede del Tribunal Supremo de Puerto Rico y el parque Luis Muñoz Rivera, en que el policía William Acevedo Martínez (en adelante, "policía Acevedo Martínez") resultó mortalmente

herido a cuchilladas. **Al llegar a un cuartel, el referido sargento tomó una llamada en que una persona con voz femenina le dijo que un tal Gerardo Ramos Santos (en adelante, "señor Ramos Santos"), quien se había escapado del Campamento Penal de Guavate, había entrado al apartamento 1003-A del Residencial Las Acacias con un revólver en la mano y la ropa ensangrentada.** La persona, antes de colgar súbitamente, también mencionó a una tal Judith.

**Prontamente, el sargento, como con treinta (30) policías armados, se personaron al residencial, rodearon el edificio y registraron, piso por piso, hasta llegar al piso diez (10).** El referido sargento y otros dos policías se dirigieron al apartamento 1003-A, cuya dueña se llamaba María Judith Fernández Ramos.

Al llegar frente a dicho apartamento, el sargento comenzó a llamar a "Judith" y a "Gerardo", pero nadie respondió. **En esos momentos, el referido sargento vio al acusado a través de unos bloques ornamentales. Al no abrir la puerta, la Policía la derribó. El acusado y María Judith huyeron hacia el apartamento contiguo, brincando de un balcón a otro.** Uno de los agentes ocupó una cuchilla ensangrentada que se encontraba sobre una mesa en el apartamento 1003-A.

Acto seguido, el sargento se dirigió al apartamento contiguo, el 1004-A, y tocó a la puerta. **El Sr. Juan Salas Ugarte abrió y, luego de que el sargento le expresara que estaban persiguiendo a una persona que se había internado en su apartamento, consintió a que la Policía entrara.** Al entrar,

el sargento se topó con el acusado, sentado en el pasillo, contra la pared, con las manos en la nuca. **Éste confesó haber matado al policía Acevedo Martínez para robarle el arma de reglamento y señaló con la vista al sofá, donde se encontraba el arma de la víctima**. Se ocupó el arma y se arrestó al acusado.

Posteriormente, se asignó el caso a un agente investigador, quien, como parte de la pesquisa, fue esa misma noche con María Judith Fernández Ramos, la acompañante del acusado, al apartamento de ésta, el 1003-A en Las Acacias, para inspeccionar el área. En ese segundo registro de dicho apartamento, ahora con el consentimiento de la dueña, se ocupó una camiseta blanca y un mahón, vestimenta similar a la descrita por el guardia del Tribunal Supremo de Puerto Rico que presenció parte de los hechos.

Ya iniciado el juicio, la representación legal del señor Ramos Santos solicitó la supresión del mahón y la camisa ocupados en el apartamento 1003-A, el revólver ocupado en el apartamento 1004-A y las admisiones hechas por el acusado, después de que concluyera el desfile de la prueba de ambas partes y de que la evidencia incautada hubiese sido admitida sin objeción por parte de la defensa.

Aunque el acusado no solicitó la supresión de la cuchilla ensangrentada incautada en el apartamento 1003-A ni el Ministerio Público la presentó en evidencia, resulta particularmente ilustrador, para la presente controversia, el

siguiente razonamiento de este Tribunal con respecto a ese primer registro:

> **[N]o cabe duda que el acusado apelante <u>tenía legitimación</u> <u>activa</u> para solicitar la supresión de la evidencia** obtenida por la Policía, sin orden previa, cuando los agentes irrumpieron en el apartamento 1003-A de María Judith Fernández Ramos. A pesar de que el Sargento Oliveras Nazario testificó que, **<u>antes de romper la puerta del</u> <u>apartamento y entrar</u>**, él vio al acusado a través de unos bloques ornamentales, de la exposición narrativa **<u>de la</u> <u>prueba no surge que en ese momento el Sargento lo</u> <u>reconociera y supiera que éste era el convicto</u>** que se había evadido del Campamento Penal de Guavate. Con respecto al incidente ocurrido cerca del Tribunal Supremo, **el Sargento sólo tenía la información provista por la llamada anónima recibida en el Cuartel y la descripción algo esquemática dada por el guardia de seguridad.** (Énfasis suplido). *Íd.*, pág. 373.

Ahora bien, es en el contexto específico del registro en el apartamento contiguo, el 1004-A, -- que produjo la evidencia del revólver de reglamento de la víctima y las admisiones --, que este Foro adoptó la precitada norma sobre la carencia de una expectativa razonable de intimidad de quien se encuentre "ilegalmente" en un lugar.

Posteriormente, -- y siendo el segundo de los casos en que una mayoría de este Tribunal apoya la errada conclusión a la que hoy llega --, esta Curia recurrió a la teoría de la "presencia ilegal" de *Ramos Santos* en *Acarón v. DRNA*, *supra*. **Allí, unos vigilantes del Departamento de Recursos Naturales y Ambientales (DRNA) intervinieron con unos cazadores a partir de una llamada en que el propio dueño de la finca donde se encontraban alertó sobre la presencia de estas personas en su propiedad privada sin su consentimiento, en violación de la reglamentación de dicha agencia.**[8] Al llegar al lugar, los

---

[8] Reglamento Núm. 6765 del Departamento de Recursos Naturales y Ambientales de 11 de febrero de 2004, conocido como el *Reglamento para*

referidos vigilantes registraron a los recurridos y encontraron varias presas y armas de caza, por lo que les expidieron dos boletos de falta administrativa, imponiéndoles el pago de una multa de quinientos dólares ($500) por cazar en una finca privada sin permiso del dueño.

En ese sentido, es forzoso concluir que, -- distinto a lo sucedido en el presente caso --, en las dos ocasiones en que este Tribunal ha aplicado la teoría de la "presencia ilegal", se ha tratado de situaciones en que quienes buscaban suprimir la evidencia en su contra claramente habían penetrado ilegalmente a una propiedad privada, ya sea escapando de la Policía, con un arma en la mano, durante una persecución en caliente (*hot persuit*); o para casar animales en una finca ajena sin autorización del dueño, en violación de un reglamento del DRNA, que conllevaba la imposición de una multa administrativa. Pero todavía más importante que lo anterior, ambos casos presentaban circunstancias que, por sí solas, bastaban para justificar los registros impugnados.[9]

Ahora bien, por su particular importancia y aplicabilidad a la presente controversia, debemos también analizar, con

---

*Regir la Conservación y el Manejo de la Vida Silvestre, las Especies Exóticas y la Caza en el Estado Libre Asociado de Puerto Rico.*

[9] En *Ramos Santos*, la Policía entró al apartamento 1004-A **con el permiso y consentimiento** del dueño, quien tenía el control inmediato del apartamento; el acusado había ingresado al apartamento registrado **brincando de un balcón a otro para huir de la Policía en una persecución en caliente** (*hot persuit*); el propio acusado **confesó y señaló voluntariamente** a la Policía la ubicación del arma de fuego ocupada; y hasta se **presentó tardíamente** la moción de supresión de evidencia.

En *Acarón*, -- a diferencia del caso de autos --, los cazadores **se encontraban en un campo abierto** (*open fields*); y **no ejercieron ningún acto de dominio, posesión o control** sobre la finca en cuestión, pues **ni tan siquiera tenían la posibilidad de excluir a otros** de dicho lugar.

detalle, lo recientemente resuelto, -- de manera unánime --, por el Tribunal Supremo de Estados Unidos en *Byrd v. United States*, *supra*. Allí, unos policías detuvieron a un conductor, quien era el único ocupante del vehículo.

Durante la intervención, los agentes descubrieron que el carro era alquilado y que el detenido no figuraba como un conductor autorizado en el contrato de arrendamiento. Uno de los policías le comentó a otro que el detenido no estaba en el contrato, a lo que su compañero le respondió: "**yeah, he has no expectation of privacy**". *Íd.,* págs. 400-401. Además, una búsqueda computadorizada arrojó que el detenido tenía un historial criminal, por convicciones relacionadas con armas y sustancias controladas, y una orden de arresto en su contra por violación de condiciones probatorias.

**Con esta información, los referidos agentes pidieron al detenido que se bajara del carro, y le informaron que no necesitaban su consentimiento para registrar todo el vehículo, -- incluyendo el baúl, donde mantenía efectos personales --, debido a que su nombre no estaba incluido como un conductor autorizado en el contrato de arrendamiento.**

Al verificar el baúl, los agentes encontraron un chaleco antibalas, por lo que le dijeron que lo iban a esposar. Acto seguido, el detenido comenzó a correr. Tras perseguirlo y recapturarlo, el detenido se entregó y admitió que había heroína en el carro. Se encontraron cuarenta y nueve (49) bloques de dicha droga.

En procedimientos anteriores al juicio, el imputado de delito solicitó la supresión de la evidencia incautada, al amparo de sus derechos de Cuarta Enmienda. Tanto el Tribunal de Distrito como el Tribunal de Apelaciones se negaron a suprimir la evidencia, debido a que entendieron que el imputado carecía de legitimación para impugnar el registro, bajo la premisa de que un conductor no autorizado en el contrato de arrendamiento no tiene una expectativa razonable de intimidad. El Tribunal Supremo de Estados Unidos revocó.[10]

En voz del Juez Asociado Kennedy, el Tribunal Supremo federal anunció la siguiente norma: "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy". *Íd.* pág. 411. Así, dicho foro razonó que el mero hecho de que una persona no esté autorizada para conducir un vehículo, -- u ocupar un apartamento --, en un contrato de arrendamiento, aunque se pueda configurar una violación del acuerdo, no es suficiente para concluir que asumió el control o posesión de manera ilegal, por lo que ello no necesariamente implica perder una

---

[10] Ante dicho foro, el Estado había argumentado que, al manejar el vehículo alquilado, el imputado estaba ocupando el vehículo **en violación de las condiciones del contrato de arrendamiento**. Así también, a base de una inferencia de que no iba a poder alquilar el vehículo por sí mismo por su historial criminal, el Estado señaló que el imputado utilizó a un tercero como un intermediario para engañar a la compañía de alquiler de carros, con el fin común de cometer el delito de trasiego de drogas, de modo que el imputado no podía tener mayor expectativa de intimidad que la de un ladrón. Estos planteamientos no convencieron al Tribunal.

expectativa razonable de intimidad sobre el lugar registrado o la evidencia incautada.[11]

Es, precisamente, al precitado caso, y no otros, al que debió acudir una mayoría de mis compañeros y compañeras de estrado al momento de disponer de los asuntos que nos ocupan. Lamentablemente, no lo hicieron.

De haberlo hecho, inmediatamente hubiesen notado que, no se podía sostener que el señor Apolinar Rondón se encontraba ilegalmente en el apartamento objeto del presente proceso criminal, por el mero hecho de que, -- tal como se desprende la prueba desfilada ante el Tribunal de Primera Instancia --, su nombre no figuraba en la lista de residentes autorizados en el contrato de arrendamiento entre el Sr. Víctor Benítez y el Departamento de la Vivienda, ni en la base de datos del sistema YARDI.[12] La jurisprudencia previamente citada no avala

---

[11] *Byrd v. United States*, 584 U.S. 395, 408 (2018)("[T]here may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it—perhaps the renter is drowsy or inebriated and the two think it safer for the friend to drive them to their destination. True, this constitutes a breach of the rental agreement, and perhaps a serious one, but the Government fails to explain what bearing this breach of contract, standing alone, has on expectations of privacy in the car.").

[12] Debemos tener en cuenta también que la expectativa de intimidad que se pueda tener en un vehículo es mucho menor que la que se tiene en una residencia. Por lo tanto, si el Tribunal Supremo de Estados Unidos estuvo dispuesto a reconocer unánimemente que puede haber una expectativa razonable de intimidad en un carro alquilado manejado por un único ocupante que no figuraba en el contrato de arrendamiento como un conductor autorizado bajo las circunstancias de *Byrd*, entonces está más que justificado concluir que había una expectativa razonable de intimidad en un apartamento bajo los hechos del caso de marras. **Por tales razones, nos parece que la ruta adoptada hoy por la mayoría ni tan siquiera satisface las exigencias del ámbito mínimo federal.**

Pero, incluso si lo hiciera, existen bases adecuadas e independientes en el derecho estatal puertorriqueño para concluir que existía una expectativa razonable de intimidad, bajo los hechos del caso de autos, al amparo de la cláusula de la Constitución de Puerto Rico que protege la

ese proceder. El primero de los errores señalados, a nuestro juicio, no fue cometido.

Superado este asunto, pasemos ahora a examinar la segunda teoría que hoy adopta una mayoría de este Tribunal para privar al señor Apolinar Rondón de sus protecciones constitucionales, ello al no reconocerle legitimación para impugnar el registro efectuado en el apartamento donde este se encontraba. Ello, basándose en la premisa de que el apartamento aparentaba estar "abandonado" o "desocupado".

B.

i.

En esta ocasión, una mayoría de mis compañeros y compañeras de estrado pretende revivir y dotar de contenido jurídico unas expresiones, -- hechas en el vacío --, que habría realizado este Tribunal hace aproximadamente sesenta (60) años atrás, en *Pueblo v. Erausquín Martínez*, 96 DPR 1, 2 (1968). Allí, este Tribunal expresó, -- **de manera categórica, sin mayor discusión, análisis o criterios de aplicación** --, que "[l]a garantía constitucional contra allanamientos y registros ilegales no cubre el registro de estructuras abandonadas, ni la incautación de evidencia que es abandonada o arrojada por una persona". Dicha *Opinión* del año 1968 se limita a citar tres casos anteriores a la mencionada fecha para sostener tal

intimidad, la cual, según ya hemos indicado, es más abarcadora y de factura más ancha que las garantías de la Constitución de Estados Unidos.

Indistintamente de lo anterior y, como ya explicamos, una intrusión física por parte del Estado en un espacio o con efectos constitucionalmente protegidos constituye una base suficiente para activar las protecciones contra registros y allanamientos irrazonables.

conclusión. Sin embargo, ninguno de esos tres casos trata sobre estructuras abandonadas ni menciona norma alguna relativa a inmuebles.

El primer caso citado, para respaldar dicha aseveración, fue *Pueblo v. Saura Gómez*, 90 DPR 801 (1964). En éste, un agente observó cuando un acusado, al percatarse de su presencia en al área, tiró al suelo un gotero que estaba utilizando para inyectar heroína a una mujer, el cual fue incautado luego del arresto.

El segundo caso citado en *Erausquín Martínez* fue *Pueblo v. González Charón*, 83 DPR 450 (1961). En síntesis, en éste, dos agentes de Rentas Internas vieron al acusado y a otra persona mover un saco hacia el baúl abierto de un vehículo. Al percatarse de la presencia de los agentes, estas dos personas soltaron el saco y, al caer en la carretera, se rompió tanto el saco como un recipiente de cristal que había dentro, el cual resultó contener ron caña por el cual no se habían pagado los impuestos correspondientes.

El tercer y último caso citado fue *Pueblo v. Del Valle*, 83 DPR 457 (1961). En hechos similares a los anteriores, en este caso, un agente de Rentas Internas presenció cuando, al ser sorprendido por el vehículo del gobierno, el acusado arrojó a la calle una bolsa de papel que ocultaba un envase de cristal que contenía ron caña ilegal.

**En fin, todos estos precedentes se refieren claramente a objetos incriminatorios que fueron arrojados intencionalmente ante la presencia de un oficial del orden público, y no a**

**situaciones de estructuras inmuebles en estado de abandono o deterioro. Diferenciar estas dos situaciones resulta central para entender por qué la ruta adoptada por la mayoría, en este caso, es inapropiada y ajena a la excepción ampliamente recocida de objetos abandonados o arrojados a un campo abierto o a la vía pública.**

En el caso de objetos arrojados o abandonados, usualmente, un oficial del orden público observa el acto en que la persona acusada se desprende, arroja o descarta el bien mueble, -- casi siempre de naturaleza incriminatoria --, al ser sorprendida por la presencia de las autoridades. Véase, Chiesa Aponte, *op. cit.*, pág. 395. Por tanto, bajo esta excepción, se considera que la persona renuncia a cualquier interés personal, posesorio o propietario sobre dicho objeto, lo que conlleva la pérdida de legitimación para impugnar la legalidad de la incautación. Véase, *Pueblo v. Ortiz Zayas*, 122 DPR 567, 571-574 (1941); Chiesa Aponte, *supra*, pág. 140.

Distinto es el caso de evidencia ocupada, sin una orden de registro o allanamiento, dentro de una estructura inmueble cuya apariencia se pudiera percibir como de abandono. Nótese que, en estas instancias, el uso del término "abandonada" se refiere a circunstancias diferentes.

**En el caso de objetos arrojados o descartados, dicha palabra se refiere al acto de desprenderse del bien, sin la intención de retenerlo o recuperarlo. Por el contrario, en el caso de inmuebles en estado aparente de abandono, se refiere a la apariencia física y las características del lugar, y no**

**necesariamente a una acción de rechazo o renuncia a una expectativa razonable de intimidad o al dominio, posesión o control de la estructura.** Tratar ambas situaciones como análogas, dentro de una sola excepción difusa, no sólo es irrazonable, sino que amenaza las protecciones fundamentales de los individuos contra la intromisión indebida del Estado en su intimidad y sus bienes.

Cabe destacar aquí que, a diferencia del caso de marras, la estructura donde se incautó la evidencia en controversia en *Pueblo v. Erausquín Martínez*, *supra*, constaba de un solo salón, el cual no tenía puertas ni ventanas instaladas en sus respectivos huecos, lo que permitía tanto la visibilidad como el acceso de cualquier persona desde el exterior. De este modo, los policías, en dicho caso, pudieron divisar, desde afuera, la presencia de tres personas en dicha edificación, ubicada en la comunidad La Perla de San Juan, durante un recorrido por ese sector.[13]

En cuanto a los hechos del presente caso, quedó probado, ante el foro primario, que el señor Apolinar Rondón mantuvo cerrada la puerta del apartamento donde se encontraba, de modo que el agente Rivera García se vio precisado a tocar la puerta

---

[13] En consecuencia, los agentes entraron inmediatamente a la estructura, sin encontrar ningún tipo de barrera física o visual hacia su interior, y observaron cuando uno de los acusados dejó caer una cartera, la cual resultó contener siete sobrecitos de heroína. También, sorprendieron a otro de los acusados con un sobrecito de heroína en una mano. Asimismo, en contraste con el caso de autos, uno de los acusados se declaró culpable, mientras que el resto de los acusados fueron juzgados ante jurado y declarados culpables, por lo que solicitaron, infructuosamente, un nuevo juicio y la revocación de las sentencias. Así, los hechos y las circunstancias procesales de *Pueblo v. Erausquín Martínez,* 96 DPR 1 (1968), distan mucho de las del presente caso.

varias veces y, al no obtener respuesta, forzar su entrada a la residencia, sin la posibilidad de observar ninguna circunstancia sospechosa desde el exterior.[14]

Por tanto, queda claro que la conclusión de que no existe protección alguna contra registros y allanamientos irrazonables en estructuras aparentemente abandonas, a la que arribó esta Curia en *Erausquín Martínez*, no tan solo está muy pobremente fundamentada, sino que los hechos que promovieron su adopción en aquella ocasión son muy distintos a los del presente caso, por lo que es totalmente inadecuada su aplicación aquí.

ii.

Ante esta innegable realidad, una mayoría de este Tribunal tuvo que recurrir a otras jurisdicciones y cortes federales inferiores para intentar delinear unos factores en aras de aplicar, a la causa de epígrafe, tan desacertada y peligrosa excepción. Basta con analizar tres casos citados por una mayoría de mis compañeros y compañeras de estrado para entender los graves problemas que presenta la metodología que hoy se integra a nuestro ordenamiento y su clara inaplicabilidad al caso de marras.

---

[14] Con respecto a la situación procesal, tanto el tribunal de récord que escuchó y apreció la prueba, así como el tribunal intermedio que pasó juicio sobre los planteamientos del Ministerio Público, estuvieron de acuerdo en que procedía suprimir la evidencia incautada.

Comencemos por examinar el caso, -- emitido por el tribunal apelativo intermedio del estado de Michigan --,[15] que estableció, por vez primera, la enumeración de los factores que la mayoría adopta, en esta ocasión, para validar registros sin orden cuando un policía tenga una "creencia objetivamente razonable"[16] de que una estructura, -- incluyendo hogares --, está abandonada o desocupada. Se trata del caso *People v. Taylor*, 253 Mich. App. 399 (2002). Los criterios allí elaborados fueron los siguientes: (1) la apariencia exterior del inmueble; (2) su condición general; (3) el estado de la vegetación en la propiedad; (4) la existencia de barreras colocadas y firmemente aseguradas en todas las aberturas; (5) señales de que la residencia no recibe servicios independientes de gas o electricidad; (6) la ausencia de enseres electrodomésticos, muebles u otros enseres comúnmente encontrados en una vivienda; (7) el tiempo que transcurre antes de que las barreras temporales sean sustituidas por puertas y ventanas funcionales; (8) el historial del inmueble

---

[15] La Corte de Apelaciones de Michigan equivale al Tribunal de Apelaciones de Puerto Rico, tanto en su jerarquía como en su organización, jurisdicción y competencia.

[16] Debemos destacar que el estándar que han sentado los casos citados del estado de Michigan es "**by _all_ objective manifestations**", lo que no necesariamente equivale a la traducción al español, adoptada por la mayoría, de "**creencia objetivamente razonable**". El lenguaje original parece ser más restrictivo o estricto que el de la traducción que utilizó la opinión mayoritaria en esta ocasión. Algunos circuitos apelativos federales han determinado que, bajo la Cuarta Enmienda, se requiere que el estándar para determinar que una estructura está abandonada es "**clear, unequivocal and unmistakable evidence**", el cual es mucho más estrecho que el adoptado por la mayoría. *United States v. Harrison*, 689 F.3d 301, 309 (3d Cir.2012), cert. denegado, 568 U.S. 1242 (2013). Véase, también, *Friedman v. United States,* 347 *F.*2d 697, 704 (8th Cir.) ("Proof of abandonment must be made by the one asserting it by clear, unequivocal and decisive evidence." (citas internas omitidas)), cert. denegado, 382 *U.S.* 946 (1965).

y su uso previo; y (9) denuncias relacionadas con actividades ilícitas llevadas a cabo en la estructura. *Íd.*, pág. 297 (traducción suplida por la *Opinión* mayoritaria).

En síntesis, en este caso, tras múltiples quejas, dos agentes fueron despachados para investigar, una vez más, una casa abandonada, que tenía un historial de actividades relacionadas con drogas, donde encontraron al acusado sentado en una mesa con bolsitas que aparentaban ser crac. **Dicha estructura se veía claramente abandonada y desocupada desde el exterior. Los huecos de las ventanas estaban vacíos o sólo estaban tapados con paneles, y todos los huecos de las puertas estaban totalmente expuestos, permitiendo el libre acceso y visibilidad desde el exterior. De hecho, los agentes podían ver directamente el interior de la casa a través del hueco vacío de la entrada trasera. Asimismo, durante el transcurso de seis (6) años, la Policía había tenido que acudir a dicha residencia específica en, al menos, quince (15) ocasiones, tras múltiples querellas por actividades ilícitas, y habían ocupado drogas anteriormente en ese lugar.**

Por tales razones, bajo las circunstancias que motivaron la adopción de los factores de *Taylor*, no había ninguna manera de preservar una expectativa razonable de intimidad en aquella casa, pues no se tenía ni tan siquiera la posibilidad de excluir a otros de su interior.

Interesantemente, el mismo foro que elaboró los criterios de *Taylor* rehusó aplicar la excepción de "estructura abandonada" en el primer caso que hoy cita la mayoría al

incorporarlos en nuestro ordenamiento. Se trata de *People v. Mayweather*, 2009 WL 1099729 (Mich. Ct. App. Apr. 23, 2009).

**Allí, un policía comunitario acudió a una casa, tras recibir una llamada en la que se alertaba que supuestamente una persona se estaba quedando en dicha residencia sin autorización. Al llegar, el agente observó que el exterior de la casa se veía sucio, que no se había podado la grama en buen tiempo y que había una acumulación de basura en el exterior.** Al bordear la casa, se percató de que la puerta trasera no tenía puesto el seguro. Sin antes obtener una orden de registro, el agente, junto a otros dos, decidió entrar a la residencia. **Una vez dentro, encontró que no tenía electricidad, un inodoro estaba lleno de heces fecales y había algunas pertenencias apiladas como si alguien las hubiera dejado tiradas.** Tras observar al acusado en el segundo piso, los agentes entraron a un cuarto, donde hallaron una bolsa de cocaína, por lo que fue arrestado.

El acusado pidió la supresión de la evidencia, a lo que accedió el foro primario. En apelación, el Estado pidió la revocación de dicha determinación, bajo el fundamento de que el acusado no tenía una expectativa razonable de intimidad en aquella casa, conforme a los factores de *Taylor*, por lo que carecía de legitimación para impugnar el registro.

Al determinar que no procedía revocar al foro inferior, el Tribunal de Apelaciones de Michigan razonó que el acusado había tomado las precauciones que normalmente se esperan para preservar la privacidad, al mantener puertas y ventanas que

impedían la visibilidad y el acceso desde el exterior, aunque una de ellas no haya tenido el seguro puesto al momento de la entrada de los agentes. Además, dicho foro consideró que no había un historial de quejas sobre actividades ilícitas en esa casa.

También, -- particularmente relevante para la presente controversia --, la Corte enfatizó que **no fue hasta después del arresto** que los policías solicitaron información relativa a la casa con la administración de la vivienda: "The officers made no attempt to locate the owner of the house until after they entered and arrested defendant; they did not contact the Housing Authority to see if the house had been declared abandoned until after the arrest". *People v. Mayweather*, *supra*, pág. 4.

Asimismo, en *State v. Brown*, 216 N.J. 508 (2014), -- otro caso citado por la opinión mayoritaria en apoyo de su teoría --, el Tribunal Supremo de Nueva Jersey confirmó la determinación del foro de primera instancia y el foro apelativo intermedio de suprimir evidencia incautada producto de un registro sin orden judicial en una residencia que tanto los policías como fiscalía sostenían que estaba abandonada, por lo que entendían que no se podía albergar una expectativa razonable de intimidad.

**La opinión del más alto foro judicial del estado de Nueva Jersey comienza con un enunciado muy contundente, -- del que hoy nos hacemos eco: "The constitutional protections afforded to the home make no distinction between a manor estate in an**

**affluent town and a ramshackle hovel in an impoverished city".**
*Íd.*, pág. 516. Es decir, las garantías constitucionales contra registros y allanamientos irrazonables no distinguen entre una mansión lujosa en una comunidad acaudalada y una casita humilde en un barrio pobre.

**En ese caso, unos agentes, tras recibir dos confidencias, mantuvieron bajo una vigilancia de dos (2) días una casa dilapidada, la cual tenía varias ventanas rotas, carecía de un contador de electricidad; y, en su interior, estaba desordenada, tenía rotos en las paredes, estaba llena de basura y había excremento humano en el piso.** Durante el periodo de observación, los agentes divisaron, al menos, quince (15) transacciones de droga que seguían un mismo patrón, en que un comprador se acercaba a la casa y le daba dinero a uno de los acusados; y, acto seguido, uno de éstos abría el candado de la puerta principal, entraba y salía con un objeto pequeño que le entregaba a la persona. Antes de entrar a la residencia, los agentes no solicitaron una orden judicial ni investigaron la información de titularidad.

Al conceder la moción de supresión de evidencia en favor de los acusados, el foro de instancia razonó que, al cerrar la puerta principal de la casa, mostraron el grado de interés posesorio necesario para otorgarles legitimación; y que la información que tenía la policía a su disposición era insuficiente para concluir que la residencia estaba abandonada. A esos efectos, el foro primario, -- elocuentemente --, señaló: "There are impoverished citizens

who live in squalor and dilapidated housing, with interiors in disarray and in deplorable condition, and yet these residences are their homes. As succinctly stated, **there is not a 'trashy house exception' to the warrant requirement"**. (Énfasis suplido). *State v. Brown*, *supra*, pág. 534.

Otro punto para destacar de la opinión de *Brown* es la expresión de que la legitimidad de un registro sin orden no puede depender de la información que adquiera la Policía después de entrar a la residencia. Así, el tribunal en cuestión advirtió que, "[w]hen police officers conduct a search based on an objectively reasonable belief that a building is abandoned, their judgment should not be second-guessed if information gathered later reveals they were mistaken". (Énfasis suplido). *Íd.*, pág. 536.

Conforme a ello, el Tribunal Supremo de Nueva Jersey determinó que sólo se podía considerar la información que los agentes tenían antes de entrar a la casa. *Íd.*, pág. 540. Así pues, adoptar la norma de que la Policía puede entrar a una residencia para luego determinar si está abandonada o no, conforme a lo que encuentre adentro, como pretende sugerir una mayoría de este Tribunal, sería incluso más peligroso y preocupante, pues obligaría a las personas a tener que soportar una intrusión del Estado en la intimidad de su hogar, incluso en aquellos casos en que el interior de la vivienda revele que en realidad estaba ocupada.

**Regresando a los hechos de autos y habiendo discutido extensamente los casos a los que acude una mayoría de mis**

**compañeros y compañeras de estrado, al adoptar los factores de *Taylor* para determinar si una estructura está abandonada, queda claro que, no tan solo dicha excepción es inaplicable a la presente controversia, sino que presenta serios problemas en la práctica. Ello pues, deja a la discreción de los agentes del orden público el determinar si una residencia se ve lo suficientemente abandonada como para permitirle entrar y registrar, -- sin restricción alguna --, la intimidad del hogar.**

Aquí, el agente Rivera García decidió forzar la puerta del apartamento sin tener indicio alguno, antes de entrar, de que la unidad estaba abandonada o desocupada. El hecho de que algunos apartamentos del edificio estuviesen desocupados debido a trabajos de remodelación no está ni remotamente cerca de sustentar una "creencia objetivamente razonable" de que el apartamento en cuestión, -- con la puerta cerrada y sin visibilidad a su interior --, se encontraba en estado de abandono.[17] No se cometió, pues, el error señalado.

Resuelto el asunto de la legitimación para solicitar la supresión de evidencia ilegalmente incautada al amparo de las protecciones constitucionales contra los registros y allanamientos irrazonables, resta por atender los planteamientos respecto a la aplicabilidad de las excepciones

---

[17] Incluso, si se considerasen las condiciones que encontró el agente Rivera García al entrar al apartamento, tampoco surgen indicadores suficientes para concluir que dicha residencia estaba abandonada, pues **el mero hecho de que una persona tenga pocos muebles, no posea enceres o sólo tenga una alfombra para dormir no significa que alguien no pueda vivir ahí.**

del "vistazo protector" (*protective sweep*) y la doctrina de plena vista (*plain view*).

V.

A.

El Ministerio Público aduce, por último, que, si se le reconoce legitimación al señor Apolinar Rondón, entonces se debe aplicar la excepción del "vistazo protector" (*protective sweep*), establecida en *Maryland v. Buie*, 494 U.S. 325 (1990), para validar el registro particular de la habitación en que se encontraba la evidencia en controversia como uno incidental a un arresto válido.

**Sobre lo anterior, basta con señalar que, como muy correctamente afirmó el Tribunal de Apelaciones, "la modalidad de 'protective sweep' no ha sido adoptada por [este Tribunal] como excepción al registro sin orden".** *Sentencia* recurrida, pág. 14. **El profesor Chiesa explica que "[h]abida cuenta de la gran magnitud de la expectativa razonable de intimidad en el hogar, cuando el arresto se produce en la residencia del arrestado, es muy restrictivo el alcance del registro de la residencia, incidental al arresto".** (Énfasis suplido). Chiesa Aponte, *op. cit.*, pág. 379.

**Así, "[t]odavía rige aquí lo resuelto […] en *Chimel v. California* [, 395 U.S. 752 (1969)]: el registro de la residencia del arrestado se limita al lugar donde se produce el arresto y sólo al área bajo el control inmediato del arrestado, para evitar que éste tenga acceso a armas o que destruya o desparezca evidencia. Más allá de esa área, el**

**registro es irrazonable, con efecto de supresión de la evidencia incautada**".[18] (Énfasis suplido) *Íd.*

No obstante, incluso si se aplicase el "vistazo protector" de *Buie* en nuestra jurisdicción, aquí no se cumplieron los requisitos para aplicar dicha excepción. En *Buie*, el Tribunal Supremo de Estados Unidos definió este tipo de registro de la siguiente manera: **"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding"**. (Énfasis suplido). *Maryland v. Buie*, *supra*, pág. 327.

Al adoptar esta norma, el Tribunal Supremo federal enfatizó que la validez de su aplicación depende de que: (1) exista una sospecha razonable de que el área adyacente al lugar del arresto donde se hará el vistazo pudiera ocultar a una persona que represente un peligro inmediato para los policías u otras personas presentes en la escena; (2) se limiten los espacios observados a aquellos lugares en que realmente una persona que represente dicho peligro inmediato se pudiese esconder; y (3) el vistazo dure sólo lo necesario para disipar dicha sospecha razonable de que una persona peligrosa esté en el lugar

---

[18] El profesor Chiesa expresa duda en cuanto a si esta Curia adoptaría la norma de *Buie*: "En cuanto a Puerto Rico, *Chimel* es controlante. No sé si el Tribunal Supremo aprobaría la norma del vistazo protector establecido en *Buie*". Chiesa Aponte, *op. cit.*, pág.380.

registrado y, en ningún caso, podrá durar más de lo que tome hacer el arresto y abandonar el lugar. *Íd.*, págs. 334-336.[19]

Asimismo, el Tribual Supremo de Estados Unidos puntualizó que poseer una orden de arresto, junto a una sospecha razonable de que la persona que se busca arrestar se encuentra dentro de una residencia, sólo le permite a la Policía entrar y registrar los espacios de la casa donde dicha persona pudiese estar; sin embargo, una vez se encuentra a la persona, la búsqueda tiene que terminar y, en consecuencia, desaparece dicha justificación para entrar a cualquier otro cuarto. *Íd.*, págs. 332-333.

De este modo, una vez lo encontró y lo puso bajo arresto, el agente Rivera García ya no tenía justificación para seguir registrando otras habitaciones del apartamento, sobre el cual, -- conforme lo que hemos explicado antes --, el señor Apolinar Rondón retenía una expectativa razonable de intimidad y donde estaba protegido contra intrusiones físicas irrazonables respecto a espacios y efectos constitucionalmente protegidos.

Recordemos que el agente Rivera García testificó que el señor Apolinar Rondón no representaba peligro alguno para los policías ni para alguna otra persona presente, y que éste, además, respondió a los comandos que se le instruyeron.

---

[19] Cabe señalar que la norma de *Buie* admite dos tipos de registros incidentales al arresto: (1) en las áreas **inmediatamente adyacentes al lugar del arresto**, -- como, por ejemplo, un clóset **en el cuarto <u>en el que ocurrió el arresto</u>** --, no hace falta una sospecha razonable, pues se busca proteger la seguridad de los agentes en el área inmediata donde están interviniendo con la persona; y, distinto al primero, (2) en otros cuartos y espacios distintos del que ocurre el arresto, **hace falta articular una sospecha razonable de que hay una persona peligrosa ocultándose** y cumplir con los demás requisitos antes mencionados. Ninguna de estas dos modalidades resulta aplicable a la presente controversia.

Asimismo, el referido agente declaró que no tenía indicio alguno de que otra persona se encontrara en el apartamento.

Además, en el presente caso, quedó probado que el registro en controversia ocurrió después del arresto del señor Apolinar Rondón. A su vez, la evidencia incautada se encontró en un gabinete más pequeño ubicado encima del clóset, el cual tenía un par de puertas independientes de las de dicho armario.

Por tanto, siendo claramente inaplicable aquí la excepción del "vistazo protector", pasemos entonces a considerar el segundo fundamento que el Ministerio Público trae ante nuestra consideración, respecto a la excepción de evidencia a plena vista (*plain view doctrine*).

B.

Para admitir evidencia incautada sin una orden judicial previa que se haya encontrado a plena vista o percepción del agente del orden público, se tienen que cumplir los siguientes requisitos:

> (1) el artículo debe ser descubierto por estar a plena vista y no en el curso de o por un registro; (2) el agente debe haber tenido un derecho previo a estar en la posición desde la cual se percató del objeto a ser incautado; (3) el objeto debió descubrirse inadvertidamente, y (4) la naturaleza delictiva del objeto debe surgir de la simple observación. (Énfasis suplido). *Pueblo v. Báez López*, *supra*, pág. 938; *Pueblo v. Dolce*, *supra*, pág. 436.

Como se explicó anteriormente, la evidencia incautada se encontró dentro de un gabinete ubicado en la parte superior del clóset de una habitación distinta, a una distancia de entre unos quince (15) a veinte (20) pies del espacio donde ocurrió el arresto. Dicho gabinete tenía instalado un par de puertas por separado del par de puertas del armario.

Esta evidencia, pues, se encontró como resultado de un registro intencional en dicha habitación, y no como una observación incidental o inadvertida. Además, al haber encontrado y arrestado al señor Apolinar Rondón antes de entrar al cuarto en cuestión y no tener indicios de que hubiese otra persona que les pudiera hacer daño en el apartamento, los agentes no tenían justificación alguna para estar legítimamente en un lugar que les permitiese observar los objetos incautados ni su naturaleza delictiva evidente.

Por tanto, resulta claro que dicha excepción no se puede aplicar a los hechos. Este error tampoco se cometió.

## V.

En fin, ninguno de los errores señalados por el Ministerio Público se cometió. Aunque diferimos en el razonamiento adoptado por los foros inferiores respecto a la ausencia de una expectativa razonable de intimidad, entendemos que tanto el Tribunal de Primera Instancia, como el Tribunal de Apelaciones, actuaron correctamente al concluir que procedía la supresión de la evidencia obtenida en un registro patentemente irrazonable.

## VI.

A modo de epílogo, debemos plasmar una preocupación final con respecto a la norma que la mayoría ha adoptado, en esta ocasión, con muy poca o ninguna consideración a los efectos que tendrá su aplicación en nuestro contexto puertorriqueño.

Es una dolorosa e ignorada realidad del Puerto Rico de hoy el que numerosas familias viven situaciones de necesidad

extrema. Son muchos los puertorriqueños y puertorriqueñas que, -- ya sea por su situación económica, vejez, enfermedad, diversidad funcional o salud mental --, residen en moradas sin acceso a servicios básicos, con vegetación descontrolada, entre una acumulación excesiva de pertenencias,[20] infestadas por plagas o animales, sin una limpieza o higiene adecuada, con falta de mantenimiento o reparación de daños o deterioro significativos, entre muchas otras dificultades.

Algunos adultos mayores mantienen ciertas ventanas de sus casas cubiertas permanentemente con paneles de madera o planchas de metal para protegerlas de la amenaza constante que representan los fenómenos atmosféricos, debido a la imposibilidad de conseguir a alguien que se las remueva o reinstale en cada temporada de huracanes. Ello, sin mencionar las centenas de residencias cuyos techos eran unos simples toldos azules, que, de temporeros, pasaron a ser casi permanentes durante años luego del paso del huracán María por nuestro archipiélago.

Como si lo anterior fuera poco, situaciones como el alto costo de vida, eventos catastróficos y búsqueda de mejores oportunidades han provocado que cientos de miles de personas hayan tenido que tomar la difícil decisión de abandonar la tierra que aman, muchas veces dejando atrás y vulnerables a familiares, lo que agrava las circunstancias mencionadas.

---

[20] Este tipo de situación es común entre personas que padecen del trastorno de acumulación compulsiva (*hoarding disorder*). Véase, *Trastorno de acumulación compulsiva*, Mayo Clinic, https://www.mayoclinic.org/es/diseases-conditions/hoarding-disorder/symptoms-causes/syc-20356056 (21 de marzo de 2023).

Todos estos escenarios son susceptibles de interpretarse erróneamente como inmuebles "abandonados" o "desocupados". Pero lo cierto es que, frecuentemente, en esas estructuras vive gente. Lo que para algunos sólo podría significar estorbo o miseria, para esas personas significa hogar. ¿Esto les hace menos acreedoras de los derechos constitucionales que cobijan a quienes tienen los recursos para mantener sus casas en óptimas condiciones?

Resulta particularmente revelador que el único caso en nuestra jurisdicción en que se validó un registro bajo la excepción de "estructura abandonada" haya ocurrido en el sector La Perla de San Juan. En esta comunidad, -- que ha sido históricamente marginada --, abundan residencias que, según los criterios ahora incorporados por la mayoría, pudieran aparentar estar abandonadas, pero éstas, realmente, son la morada de familias tan dignas como cualquier otra.

**El alcance de los derechos constitucionales no se debería medir según la altura de la grama, la cantidad de muebles o electrodomésticos que se posean, el lustre de la fachada, la disponibilidad de servicios esenciales ni la presencia de la palabra "residencial" en el nombre del lugar donde se vive.**

VII.

Es, pues, por los fundamentos anteriormente expuestos, -- y, muy particularmente --, por entender que una mayoría de mis compañeros y compañeras de estrado ha optado por incorporar innecesaria e irreflexivamente un marco de análisis escabroso y peligroso para validar una excepción improcedente al

requisito de obtener una orden judicial antes de realizar un registro o allanamiento en una residencia, la cual terminará afectando desproporcionadamente a las comunidades más desventajadas de nuestra sociedad, que disentimos.


                                        Ángel Colón Pérez
                                         Juez Asociado